**Charles B. CLEMENT, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent,**

**Chicago Board Options Exchange, Inc., Intervenor-Respondent.**

**No. 81–1583.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1982.

Decided April 5, 1982.

---

14. Appellee's Brief at 7–8.

Alton B. Harris, Coffield, Ungaretti, Harris & Slayings, Chicago, Ill., for petitioner.

Anne Chafer, Securities & Exchange Comm., Washington, D. C., Arne R. Rode, Chgo. Bd. Options Exchange, Chicago, Ill., for respondent.

---

* Robert D. Morgan, Chief District Judge for the Central District of Illinois, is sitting by

Before PELL and BAUER, Circuit Judges, and MORGAN, Chief District Judge.*

PELL, Circuit Judge.

Charles B. Clement petitions for review of an order of the Securities and Exchange Commission (Commission or SEC) approving, pursuant to section 19(b)(2) of the Securities Exchange Act of 1934, 15 U.S.C. § 78s(b)(2) (1976) (Act), a rule change proposed by the Chicago Board Options Exchange, Inc. (CBOE). The rule change eliminates supplemental appointments for market makers on the CBOE and requires that the lesser of 75% of a market maker's transactions or 20,000 contracts per quarter be executed in person and not through a floor broker.

Clement argues that the rule change imposes burdens on competition not necessary or appropriate in furtherance of the purposes of the Act and that the rule change unfairly discriminates among market makers on the CBOE. He also contends that the Commission order approving the proposed rule change is arbitrary and capricious because of a failure to articulate reasons for finding the proposed rule change consistent with the requirements of the Act.

## I. FACTS

In order to make clear the impact of the challenged rule change on Clement, we must recite at some length pertinent aspects of the CBOE regulatory scheme both as it existed when Clement became a member of that Exchange and as it is affected by the rule change.

### A. *Background*

The CBOE was incorporated in 1973. Because the Chicago Board of Trade (CBT or CBOT) had devoted substantial time and money to the development of the CBOE, special benefits were conferred upon full members of the CBT. Article Fifth of the

designation.

CBOE Certificate of Incorporation provided that full members of the CBT could join the CBOE without paying the membership fee. This opportunity would have been of little value to a CBT member, however, if he were expected to be on the floor of the CBOE on a full-time, or nearly full-time, basis because of his obligations on the CBT floor.

The original CBOE rules addressed this problem by creating two classes of market-maker appointments. Market-maker status both imposes obligations and confers benefits on CBOE members. A market maker is a dealer who places his own capital at risk by buying and selling options for his own account. He is expected to contribute to price continuity on the Exchange. For instance, a public investor might wish to sell a given quantity of a security at a certain price at a time when there is no other public investor wanting to buy the stated quantity at the given price. When this occurs, a market maker is expected to buy for his own account. In return for undertaking these special obligations to the market, market makers enjoy advantages not available to others. One principal advantage is that Federal Reserve Board rules exempt market makers from "margin" rules that limit the amount one may borrow in order to finance trading activity. *Compare* 12 C.F.R. § 220.4(g) (1981) *with id.* § 220.8(f).

The first class of market-maker appointment that existed under the original rules was a "principal appointment." A market maker with such an appointment had "a continuous obligation to engage in dealings for his own account where there exists, or it is reasonably anticipated that there will exist [a need for market makers in any class of option for which he holds a principal appointment]." CBOE Rule 8.7(b). A CBT member who could show that "he is, or promptly after his being granted one or more Appointments will be, primarily engaged as a trader or broker on the Chicago Board of Trade," CBOE Rule 8.3.02, could obtain a "supplemental appointment." One holding a supplemental appointment was required to undertake the obligations of a

CBOE market maker only "in response to a demand therefor from the Board Broker or Order Book Official that performance of such obligation by other Market Makers requires supplementation." CBOE Rule 8.7(a). These two sets of market-maker obligations were found to be consistent with the Act. *See* Securities Exchange Act Release No. 9985 (Feb. 1, 1973).

All market maker transactions must be initiated on the floor of the Exchange. Under the original rules, however, a market maker who was on the floor could place an unlimited percentage of his orders with floor brokers rather than fully executing them himself. CBOE Rule 8.1.

The combined effect of these rules was to permit CBT members to obtain supplemental appointments permitting them to trade on the CBOE on a part-time basis. This allowed the CBT member to fulfill his obligations to the public on that Exchange and also to engage in a volume of trading on the CBOE that made his market making economically viable.

## B. Proposed Rule Change

Following a routine inspection of the CBOE in November, 1979, the Associate Director of the Division of Market Regulation at the SEC wrote the CBOE a letter. He suggested that the CBOE consider whether market makers should be permitted to trade on the CBOE without undertaking the obligations of a principal appointment. When the CBOE responded in June of 1980, it first explained why the supplemental appointment had been created at the inception of the CBOE. It then continued:

> We have reconsidered the issue in light of the comments in your letter of November 7 and have concluded that the present market making capacity of CBOE makes it possible to adopt a rule which would require every CBOE market-maker to accept an appointment to at least one Group of underlying stocks. We are filing under separate cover a proposed rule change (SR–CBOE–1980–16) to accomplish this purpose.

The proposed rule change amends CBOE Rule 8.3 to require that a market maker accept an appointment in one or more classes of options contracts. It also amends CBOE Rule 8.7(b) so as to extend the "continuous obligation" requirement to all market makers and to eliminate any reference to supplemental appointments. A new requirement is also added to CBOE Rule 8.7:

[F]or each quarter, except for unusual circumstances, a Market-Maker must execute in person and not through the use of orders either (a) 75% of his total trading activity less closing transactions not executed in person (measured in terms of contract volume) or (b) 20,000 contracts in those classes to which a Market-Maker holds an Appointment.

### C. Impact on Clement

Clement became an associate member of the CBT in March, 1974. This membership entitled him to trade only financial instruments on the floor of the CBT. He subsequently became interested in taking advantage of the offer of free membership on the CBOE. In order to do so, he converted his associate membership on the CBT to a full membership at a cost of $230,000 in March, 1979. He had no interest in trading commodities other than financial instruments on the CBT, so the only reason for this expenditure was to enjoy the opportunity of trading on the CBOE.

Clement held a supplemental appointment on the CBOE. By utilizing floor brokers on the CBOE, he was able to fulfill his obligations on the floor of the CBT, which require his personal presence a substantial majority of the trading day, and also to engage in an economically viable volume of market making on the CBOE. Clement trades for his own account between 6,000 and 10,000 option contracts per quarter on the CBOE.

### D. Approval of the Proposed Rule Change

The CBOE filed the proposed rule change with the SEC on June 9, 1980. The Commission gave appropriate notice of the proposed change. The CBT filed a comment letter with the Commission arguing that the change would prevent its members from exercising their right to act as CBOE market makers on a part-time basis. On February 12, 1981, the Commission issued an Order approving the proposed rule change (Order I). The only response to the CBT objection was as follows:

The Commission believes, however, that the proposed rule change would not unfairly affect the membership rights of CBOT members since it merely imposes on CBOT members the same obligations imposed on other CBOE members who register as market makers. As a result of compliance with these obligations, market makers receive certain benefits, including preferential credit treatment.

Securities Exchange Act Release No. 17535, 46 Fed.Reg. 13055 (1981).

On April 14, 1981, Clement petitioned for a stay, pending judicial review, of the rule change. The Commission denied the stay in an Order (Order II) which discussed the arguments raised by Clement and the responses of the CBOE. The Commission found that Clement had not shown sufficient likelihood of prevailing on the merits because the rule change was consistent "with the Commission's view that market making connotes a regular or continuous course of dealings in particular securities and not mere engagements in isolated trades." Securities Exchange Act Release No. 34–17185, 22 SEC Docket 1156 (June 9, 1981). The Commission also found that there was little likelihood of irreparable injury to Clement because the requirement that he execute 75% of his market maker transactions in person is applicable only when he is on the CBOE floor, acting as a market maker. Finally, the Commission found that there was a likelihood of substantial harm to interested persons or the public interest if the stay were granted because the CBOE had already devoted substantial resources to implementation of the rule change.

## II. SUBSTANTIVE CHALLENGES TO THE RULE CHANGE

In his petition for review to this court, Clement poses two substantive challenges

to the rule change. Our disposition of this case, *see* Section III, *infra*, makes it inappropriate for us to judge the merits of Clement's arguments at this time. We merely outline the contentions raised by Clement in order to give clarity to our discussion in Section III.

First, the petitioner asserts that the new rules impose an unnecessary burden on competition and are therefore inconsistent with the purposes of the Act. Section 6(b)(8) of the Act prohibits rules imposing "any burden on competition not necessary or appropriate in furtherance of the purposes of [the Act]." 15 U.S.C. § 78f(b)(8) (1976). Clement asserts that the rule change has curtailed substantially his market making activity. Apparently it is the prohibition on utilizing floor brokers to complete those transactions Clement initiates while on the CBOE floor that is principally responsible for his decreased activity on the CBOE. Clement formerly traded over 24,000 option contracts per year. He competed in each case with other market makers both as to price and as to the number of contracts he would buy and sell. Curtailment of his CBOE trading has diminished the "open competition among market makers," S.Rep.No. 94–75, 94th Cong., 1st Sess. 12 (1975), U.S.Code Cong. & Admin. News 1975, pp. 179, 190, that is "[o]ne of the fundamental purposes underlying the national market system," *id.* at 14, U.S.Code Cong. & Admin. News 1975, p. 192.

Under section 6(b)(8), such a lessening of competition is impermissible unless the rule furthers some other legitimate regulatory objective. In Clement's view, the SEC has failed to articulate any reason why this anticompetitive effect is necessary.

Clement's second argument is that the rule change unfairly discriminates among dealers. Section 6(b)(5) of the Act provides that the rules of a national securities exchange shall not be "designed to permit unfair discrimination between ... dealers ...." 15 U.S.C. § 78f(b)(5) (1976). The petitioner argues that the rule change is discriminatory in two senses: first, it dis-criminates against members of the CBT because, by imposing a "continuing obligation" and limiting the market maker's reliance on floor brokers, it effectively eliminates economically viable market making by a CBT member on the CBOE floor; and second, it discriminates between high and low-volume traders on the CBOE because those trading more than 20,000 contracts per quarter are exempt from the 75% personal transaction requirement. In Clement's view, this result is inconsistent with the purported purpose of having market makers "personally effecting transactions."

## III. CONCLUSORY CHARACTER OF THE SEC DISPOSITION

Clement's third argument is that the Commission's Order cannot be upheld because the conclusory nature of Order I fails to permit meaningful judicial review. The petitioner relies on *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), in which the Supreme Court stated that "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *Id.* at 94, 63 S.Ct. at 462. In Clement's view, the failure of the SEC disposition to meet this standard renders it "arbitrary" so that it cannot be upheld pursuant to the standard of review articulated in 15 U.S.C. § 78y(b)(4) (1976).

The preliminary issue raised by this argument, which is contested by the parties, is whether Order II should be considered by this court or whether the Commission's approval of the rule change must be reviewed by reference only to Order I. The petitioner suggests that Order II is a post-hoc rationalization for administrative action already taken and cannot be the basis for upholding the Order. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962). The Commission urges that Order II is a part of the record of administrative proceedings that is properly before the court pursuant to Fed.R.App.P. 16(a). The only case that appears to be

directly on point is *Local 814, International Brotherhood of Teamsters v. NLRB*, 546 F.2d 989 (D.C.Cir.1976) (per curiam), *cert. denied*, 434 U.S. 818, 98 S.Ct. 56, 54 L.Ed.2d 73 (1977). *Local 814* holds that the prohibition against post-hoc rationalizations applies only to rationalizations offered for the first time in litigation affidavits and arguments of counsel and does not prohibit an agency from "submitting an amplified articulation" of its original conclusions. *Id.* at 992. We conclude that Order II is relevant to our review of the SEC's approval of the proposed rule change. We do recognize, however, that once an agency has decided on a course of action, any subsequent consideration it gives to the merits may be somewhat biased towards justifying its original decision. We think therefore that Order II commands less deference from this court than we would accord the same order had it been published contemporaneously with the initial approval of the rule change. *See Bradford National Clearing Corp. v. SEC*, 590 F.2d 1085, 1103 (D.C.Cir.1978).

■ Section 19(b)(2) of the Act, 15 U.S.C. § 78s(b)(2) (1976), provides, in pertinent part: "The Commission shall approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of this chapter and the rules and regulations thereunder applicable to such organization." Among the applicable requirements of Title 15, Chapter 2B, dealing with securities exchanges, are factors that the Commission is required to consider before registering a securities exchange, 15 U.S.C. § 78f(b)(1)–(8) (1976). These include determinations that the "rules of the exchange . . . are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers . . . .," *id.* § 78f(b)(5), and that the rules "do not impose any burden on competition not necessary or appropriate in furtherance of the

purposes of this chapter," *id.* § 78f(b)(8). Read together, these statutory sections suggest that both the anticompetition and discrimination issues were, or should have been, relevant to the Commission's initial decision to approve the rule change.[1] We find little evidence in Order I that the Commission considered either concern.

The conclusions pertinent to the competition and discrimination points stated in Order II are essentially: (1) that the rule change is consistent with the Commission's view that market making connotes a continuous activity, and (2) that Clement won't be irreparably injured because the 75% requirement pertains only to market-maker transactions executed while on the CBOE floor.

First, we note that these conclusions fail to address one prong of Clement's discrimination argument: that exemption from the 75% requirement of those who trade over 20,000 contracts per quarter is inconsistent with the Commission's goal of having market makers personally present on the CBOE floor. It would seem that if the Commission's purpose is to have market makers on the floor as much as possible, one executing 60,000 contracts per quarter should be required to participate personally in 45,000 rather than merely 20,000 of them.

Second, we are not convinced that even this more detailed Order adequately addresses Clement's particular situation. Let us assume the truth of three propositions urged by Clement and nowhere refuted by the SEC: (1) Clement's CBT obligations limit the amount of time he can spend on the CBOE floor; (2) the number of market maker transactions in which he can participate will decrease from 6,000 per quarter if he must fully execute 75% of them in person; and (3) a certain volume of trading is necessary to make CBOE market making financially viable for Clement. It appears to us that the rule change may result in

---

1. We are not persuaded by the Commission's argument that Order I failed to address these questions because neither Clement nor the CBT raised them as objections. Not only do we think that the Commission should have considered them on its own initiative, but we also conclude that the CBT's comment letter to the SEC implicitly raised both issues. We note that the Commission stated in Order II: "Clement's arguments in support of the stay are similar to those made by the CBT in its comment letter opposing the subject rule change."

Clement and other CBT members ceasing to trade as market makers on the CBOE. That result is anticompetitive. We recognize that maintaining competitiveness is only one purpose of the Act and that the Commission might find this burden on competition a necessary effect of furthering other goals of the Act. *See* 15 U.S.C. § 78f(b)(8) (1976). This is not, however, the approach taken by the SEC in Order II. That Order states, "while [the 75%] provision may require Petitioner to alter the manner in which he trades on the CBOE floor, Petitioner has not shown that this requirement precludes him from continuing to act as a market maker while continuing to function as a floor broker on the CBT." The Commission refuses to acknowledge that Clement might be precluded, by economic reality, from acting as a market maker on the CBOE. By so doing, it assumes away any anticompetitive effect of the rule change. As a result, Order II does not evidence any balancing between the goals of maintaining competitiveness and insuring price continuity.[2]

In our view, Order II does not demonstrate a careful analysis by the Commission of the rule change's impact. Further, we are unwilling to accord this non-contemporaneous justification for the rule change the same deference we would had it been published at the time of initial approval. We therefore conclude that the Order of the Commission approving the proposed rule change must be vacated and the case remanded to the Commission for further proceedings consistent with this opinion.

---

2. Presumably the Commission has concluded that a market maker who cannot meet the 75% or 20,000 contract per quarter requirement is not fulfilling his obligation to eliminate temporary price disparities.