UNITED STATES of America, Plaintiff,

and

State of Michigan, Intervening Plaintiff,

v.

AKZO COATINGS OF AMERICA, INC., Chrysler Motors Corporation, Detrex Corporation, Fabricon Automotive Products, Federal Screw Works, Ford Motor Company, General Motors Corporation, Hoechst Celanese Corporation, Michigan Industrial Finishes, Inc., RPM, Inc., TRW, Inc., Uniroyal, Inc., Defendants.

No. 88–CV–73784–DT.

United States District Court, E.D. Michigan, S.D.

Aug. 9, 1989.

Geneva S. Halliday, Asst. U.S. Atty., Detroit, Mich., Barbara Rogers, U.S. Dept. of Justice, Washington, D.C., Connie Puchalski, Asst. Regional Counsel, U.S.E.P.A., Chicago, Ill., for U.S.A.–E.P.A.

Robert P. Reichel, Asst. Atty. Gen., Lansing, Mich., for State of Mich.

J.K. MacKendree Day, Chicago, Ill., for Akzo Coatings of America, Inc.

Keith J. Lerminiaux, Vandeveer Garzia, Detroit, Mich., for Chrysler Motors Corp.

John A. Kruse, Harvey, Kruse, Westen & Milan, Detroit, Mich., Robert A. Emmett, Reed, Smith, Shaw & McClay, Washington, D.C., for Detrex Corp.

David Matthews, Eagle–Picher Industries, Cincinnati, Ohio, John Toczylowski, River Rouge, Mich., for Fabricon Automotive Products.

Frank S. Galgan, Freud, Markus, Slavin & Galgan, Troy, Mich., for Federal Screw Works.

Margaret A. Coughlin, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, Mich., Mark D. Edie, Dearborn, Mich., for Ford Motor Co.

David L. Tripp, Dykema Gossett, Detroit, Mich., for General Motors Corp.

Gary Rowen, Associate Gen. Counsel, Hoechst Celanese Corp., Somerville, N.J., for Hoechst Celanese Corp.

Mark J. Rudolph, Provizer, Lichtenstein, Pearlman & Phillips, Southfield, Mich., for Michigan Industrial Finishes, Inc.

David L. Maurer, Pepper, Hamilton & Scheetz, Detroit, Mich., for TRW, Inc., and Uniroyal, Inc.

## MEMORANDUM OPINION AND ORDER

WOODS, District Judge.

The United States Environmental Protection Agency (EPA) has filed this action against twelve parties that are potentially responsible for the clean up of a toxic waste site located in Oakland County, Michigan. The EPA has filed a Motion for Entry of a Consent Decree that it has negotiated with the defendants. The State of Michigan has filed a Motion to Intervene to challenge the consent decree.[1]

### I. FACTS

In the late 1960s, liquid and solid industrial wastes were illegally dumped in a 110 acre site in Rose Township, Oakland County. In 1979, the Michigan Department of Natural Resources (MDNR) learned of the existence of the thousands of drums of waste at the site and initiated investigations. Based on sampling and testing, the Michigan Toxic Substance and Control Commission declared a toxic substance emergency and 5,000 drums of toxic waste were immediately removed from the site.

After initial investigations, the EPA notified several companies that they were potentially responsible parties (PRPs) under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) and, consequently, responsible for the clean up of the site. On September 8, 1983, the EPA placed the Rose Township site on the National Priorities List, the national list of hazardous waste sites posing the greatest threat to health, welfare, and the environment. 40 C.F.R. Part 300, Appendix B.

All sites placed on the National Priorities List must undergo a Remedial Investigation and Feasibility Study (RI/FS) to assess the site conditions and possible remedies. 42 U.S.C. § 9616(d). In June, 1987, the MDNR concluded the RI/FS for the Rose Township site, which the state agency conducted pursuant to a cooperative agreement with the EPA.

The RI/FS showed two primary areas of contamination: (1) less than one acre in the northeast portion of the site that contains ground water contaminated by vinyl chloride and surface soils having elevated levels of arsenic; and (2) twelve acres in the southwest corner of the site that contain surface soils contaminated with polychlorinated biphenyls (PCBs), lead, arsenic, and other toxic metals; subsurface soils contaminated with a variety of volatile organic compounds (VOCs) and semi-volatile organic compounds (SVOCs); and ground water

---

1. The Court issued a bench opinion on the State's Motion to Intervene on May 4, 1989, and a bench opinion on the EPA's Motion for Entry of a Consent Decree on July 18, 1989. This Memorandum Opinion and Order incorporates those bench opinions and supersedes them to the extent they contradict this opinion.

contaminated with PCBs, metals, VOCs and SVOCs.

Any method selected to remedy the hazardous waste site must attain "applicable or relevant and appropriate requirements" (ARARs), unless the EPA waives adherence to the ARARs by making specific findings. 42 U.S.C. § 9621(d). The preferred clean-up remedy identified by the RI/FS for the Rose Township site included a combination of excavation and onsite thermal destruction of soil contaminants and ground water treatment to remedy the ground water. Soil flushing, a method by which the contaminated soil is flushed with water and the resulting flushate is treated to designated clean-up levels and reinjected into the soil, was not found to be applicable. The RI/FS indicated that soil flushing is only a viable remedy for soluble chemicals in permeable soils and that the Rose Township soils were marginally suitable due to variable permeability.

In 1987, the EPA issued its Record of Decision setting forth its initial remedy for the site. The State of Michigan concurred in the Record of Decision, which required:

(1) Construction of a fence around the site;

(2) Excavation of approximately 50,000 cubic yards of contaminated soil, incineration of the excavated soils that were contaminated with PCBs, VOCs and SVOCs, and proper treatment and disposal of the resulting incineration ash; and

(3) Extraction and on-site treatment of contaminated ground water to adjacent marshlands or an alternative location.

The Record of Decision included a detailed explanation of the reasons for selecting the remedy and specific findings that the remedy satisfied the requirements of CERCLA, including the protection of health and environment, the compliance with federal and state ARARs, cost effectiveness, and the use of permanent solutions and alternative treatment technologies to the maximum extent possible.

The Record of Decision explicitly found that the soil permeability of the site varies too greatly to properly perform soil flush-ing; however, soil flushing was not ruled out. The relevant passage of the Record of Decision provides the following:

If the treated ground water is not dischargeable into the marshes, it may have to either be sent to a local POTW or reintroduced into the ground water system. Reintroduction into the ground water onsite may lead to a variation of the thermal destruction remedy, if the treated waters are allowed to percolate back into the water table through the excavation pit. In this scenario, the PCB-contaminated soils are excavated and incinerated as planned. The treated waters, meanwhile, are drained into the excavated pit where, in theory, the VOCs and the SVOCs in the soils are flushed out into the ground water. After the PCBs have been incinerated, the flushing mechanism will be evaluated to see if it has reduced the volume of VOC-contaminated soils to be incinerated, which may result in a less expensive remedy. The chemicals which may have been flushed into the ground water in this manner will be removed by the ground water treatment technology already in place. After soils leachability tests during design, if this alternative method of VOCs clean up is found to be practical, the ROD will be reopened for public comment before implementation of the flushing variation.

Record of Decision, at 28–29. The Record of Decision provided that eight criteria will be evaluated in considering whether to substitute soil flushing for thermal incineration: economy of scale; community acceptance; clean-up time; land regulations; reliability of soil flushing; implementability; complete site remediation; and cost effectiveness.

In June of 1987, the EPA began settlement discussions with potentially responsible parties (PRPs). Eventually, the EPA became persuaded that the soil flushing method may be a viable, less costly alternative to the incineration of the VOC/SVOC contaminated soil, and could result in a clean up that would comply with all federal and state ARARs.

In September of 1988, the EPA filed its complaint in this action and accompanied it with a proposed consent decree. At the same time it issued a three page document entitled Proposed Settlement Plan Explanation of Significant Differences. The Plan Explanation stated that the newly proposed consent decree differed significantly from the EPA's initial Record of Decision by allowing an attempt to clean up the VOC contaminated soil through a soil flushing system. The Plan Explanation also acknowledged that soil flushing had been rejected as a viable remedy for the site, but asserted that the objections to soil flushing had been adequately addressed by the settling defendants.

As required by law,[2] the EPA provided a period for public comments on the proposed changes to the Record of Decision. The EPA received written comments from the MDNR, the Toxic Substance Control Commission, two Congressmen, the Environmental Defense Fund, the Michigan Environmental Council, several residents of Rose Township, and the settling defendants. The only comments supporting the EPA's proposed selection of soil flushing were submitted by the settling defendants.

Those that objected to soil flushing were concerned that it was not a well-demonstrated technology, especially in a cold weather environment like Michigan; that the flushing may take up to fifteen years as opposed to a two year incineration method; that it is extremely difficult to monitor the effectiveness of soil flushing; and that soil flushing may violate Michigan's ground water anti-degradation laws.[3] There were also concerns that the proposed amendment did not adequately define the alternative permanent remedy that the defendants were obligated to perform if soil flushing did not achieve established cleanup levels within the required time frame.

The settling defendants asserted that the proposed amendment would protect human health and the environment. They accompanied their comments with a study performed by the Gradient Corporation, an environmental consulting firm, which concluded that approximately 12,325 pounds of organic chemicals would be removed by the soil incineration method and that approximately 12,234 pounds of organic chemicals would be removed by the soil flushing method. The study further added that the two amounts will be even more similar because an additional amount of soil that was not to be incinerated under the original remedy would be subjected to soil flushing under the proposed remedy.

On January 18, 1989, the EPA issued a Rose Township Record of Decision Amendment. The amendment formally adopted onsite flushing as a remedy for contaminated subsurface soils, but only if pilot testing proves that soil flushing is as protective as thermal destruction. In adopting the remedial method that it had originally ruled out, the EPA asserted that the excavation of the PCB contaminated soils will remove most of the unflushable contaminants; that borings from the site reveal that the geology of the contaminated area may not be as complex as initially anticipated; and that pilot testing had not yet been performed to rule out soil flushing.

In the amendment, the EPA made several assertions: (1) that if target clean up levels are reached by soil flushing, it will be as protective as thermal destruction; (2) that soil flushing will comply with all requirements of federal and state ARARs; (3) that soil flushing would be more cost effective than thermal destruction; (4) that, assuming the ground water treatment system uses granular activated carbon to capture the contaminants, soil flushing would satisfy CERCLA's preference for remedies that utilize permanent and innovative treatment; and (5) that soil flushing would reduce toxicity, mobility, and the volume of the contaminants to the same extent as soil flushing.

---

**2.** 42 U.S.C. § 9617(2) requires the EPA to provide a reasonable opportunity for the public to submit written and oral comments regarding the proposed remedial action plan.

**3.** M.C.L.A. § 323.1, *et seq.*, and Mich.Admin. Code R. 323.2201, *et seq.*, are collectively referred to as Michigan's anti-degradation law.

In so amending the Record of Decision, the EPA conformed the Record of Decision to the settlement it had negotiated with the defendants and had lodged with the Court in September of 1987.

## II. THE STATE'S MOTION TO INTERVENE

The State of Michigan has filed a Motion to Intervene so that it can challenge the EPA's proposed remedial action plan at the Rose Township site. In its motion, the State argues that it is permitted to file its complaint under the doctrine of Intervention as a Right, F.R.Civ.P. 24(a), and under the doctrine of Permissive Intervention, F.R.Civ.P. 24(b). The real issue, however, is not under which doctrine the State is entitled to intervene, but rather, as the defendants and the United States argue, whether the State's complaint asserts valid substantive claims upon which the State would be entitled to relief. For, under 24(c) of the Federal Rules of Civil Procedure, intervention is conditioned by the requirement that the intervenor assert a valid substantive claim for relief. Accordingly, each count of the State's complaint must be analyzed to determine if it states a valid claim for relief. Before analyzing the State's complaint, however, a limited review of some aspects of the statutory framework of CERCLA is appropriate.

## A. CERCLA'S STATUTORY FRAMEWORK

Under CERCLA, Congress charged the President with the authority to ensure the prompt clean up of hazardous waste sites. 42 U.S.C. § 9604(1). The President has delegated this authority to the Administrator of the United States EPA. 42 U.S.C. § 9615; Executive Order No. 12316 (Aug. 14, 1981). Under 42 U.S.C. § 9604, the EPA can undertake the clean up of a hazardous waste site and can recover its costs from liable parties under 42 U.S.C. § 9607. The EPA can also seek injunctive relief or issue administrative orders requiring persons subject to liability to clean up the site. 42 U.S.C. § 9606.

CERCLA envisions a substantial and meaningful role for the individual states in the development and selection of remedial actions to be taken within their jurisdictions. Under 42 U.S.C. § 9621(f), the states are provided a reasonable opportunity to review and comment on the RI/FS, the planned remedial action proposed by the RI/FS, the engineering design resulting from the selection of the planned remedial action, and other technical data relating to the implementation of a remedy. 42 U.S.C. § 9621(f)(1)(E). Additionally, states are entitled to participate in settlement negotiations, 42 U.S.C. § 9621(f)(1)(F), and are entitled to comment on the EPA's proposed remedial action plan as well as other plans under consideration. 42 U.S.C. § 9621(f)(1)(G).

CERCLA also accommodates the environmental standards and requirements of the state in which a site is located. On-site remedies selected by the EPA must attain the level of protection provided for under federal and state ARARs. 42 U.S.C. § 9621(d). Once a consent decree is proposed by the EPA, the state can challenge the consent decree if the EPA proposes implementation of a remedy for which it has waived a state ARAR. If the court upholds the EPA's waiver of the state ARAR, the state can still require compliance with the ARAR by bearing the additional costs associated with compliance. 42 U.S.C. § 9621(f)(2)(B).

## B. ANALYSIS OF THE STATE'S COMPLAINT

The complaint, which the State of Michigan intends to file if granted intervention, lists seven causes of action.

■ Count One of the complaint seeks declaratory and/or injunctive relief, pursuant to 42 U.S.C. § 9621(e)(2), to force the EPA and the settling defendants to comply with requirements of 42 U.S.C. § 9621(b) and (d) that were not met in the consent decree. Both the United States and the defendants contend that 42 U.S.C. § 9621(e) only authorizes the states to enforce provisions of *existing* consent decrees and does not authorize the State to

seek injunctive relief to impose additional remedies outside of the consent decree. The State, on the other hand, asserts that the relevant language of the provision neither refers only to a consent decree nor is limited to implementation of existing remedial actions.

Section 9621(e)(2) of Title 42 provides: A state may enforce any Federal or State standard, requirement, criteria, or limitation to which the remedial action is required to conform under this chapter in the United States district court for the district in which the facility is located. Any consent decree shall require the parties to attempt expeditiously to resolve disagreements concerning implementation of the remedial action informally with the appropriate Federal and State agencies. Where the parties agree, the consent decree may provide for administrative enforcement. Each consent decree shall also contain stipulated penalties for violations of the decree in an amount not to exceed $25,000 per day, which may be enforced by either the President or the State. Such stipulated penalties shall not be construed to impair or affect the authority of the court to order compliance with specific terms of any such decree.

42 U.S.C. § 9621(e)(2).

■ Contrary to the State's assertions, this section only provides the State with authority to ensure that the relevant parties comply with the remedial action selected for the site. It does not empower the State to require the parties to comply with standards that were not embodied in the remedial action plan.

To interpret 42 U.S.C. § 9621(e) to be a tool that ensures a proposed clean up complies with state standards not embodied in the remedial action plan would nullify the effect of 42 U.S.C. § 9621(f). Through 42 U.S.C. § 9621(f), Congress provided the states with an elaborate mechanism that assures that remedial action plans adopted by the EPA comply with all applicable state and federal standards. Under the State of Michigan's interpretation of section 9621(e), a state could obtain a judicial review of a

remedial action plan under section 9621(f) to ensure the plan conforms with applicable state and federal standards. Then, if the state was dissatisfied with the results of the § 9621(f) judicial proceeding, rather than bear the costs of requiring the plan to conform to the states' desired standards—as envisioned by section 9621(f)(2)(b)—the state could file a subsequent action under section 9621(e)(2) to obtain an additional judicial review. This clearly is not what the legislature intended.

The State maintains that such a restrictive interpretation would deprive the states of any statutory basis for enforcing the substantive clean-up requirements of section 9621(a) through (d). This is incorrect. The states are permitted to become involved in the negotiation and adoption of remedial action plans. 42 U.S.C. § 9621(f). Moreover, although the states are limited to contesting noncompliance with ARARs, the ARARs, when properly adopted pursuant to section 9621(d)(2)(C)(iii), will result in standards that each state believes are necessary to protect the concerns noted in section 9621(a) through (d). Finally, Congress was not required to provide the states with statutory mechanisms through which the states could require remedial action plans conform to the standards outlined in sections 9621(a) through (d). Congress authorized the President to ensure such compliance. 42 U.S.C. § 9621(a).

Accordingly, the State has not stated a viable claim under Count One and the Motion to Intervene is denied as it relates to that portion of the State's complaint.

■ Count Two seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, as to whether the proposed remedial action plan conforms to 42 U.S.C. § 9621. This Count is unnecessary. To the extent that the Count seeks a declaration as to whether the remedy reflected in the consent decree conforms to 42 U.S.C. § 9621, this Court will consider that precise issue in the context of the motion for entry of the consent decree— and the state is entitled to participate in those proceedings under 42 U.S.C. § 9621(f). To the extent that the Count

seeks to have this Court disregard the proposed remedy as unlawful, arbitrary or capricious, that relief is governed by section 9613(j)—and the State is certainly entitled to intervene for this purpose under 42 U.S.C. § 9613(j).

Accordingly, the State of Michigan's request to intervene for the purposes of a declaratory judgment under 28 U.S.C. § 2201 is denied as unnecessary. The State is entitled to obtain the relief sought under 42 U.S.C. § 9621(f) and 42 U.S.C. § 9613(i) and (j).

■ Count Three is premised on 42 U.S.C. § 9621(f) and seeks *de novo* review of the EPA's selected remedy and an injunction requiring compliance with 42 U.S.C. § 9621.

■ The State has asserted a viable cause of action in this Count of its proposed complaint. It has alleged that the EPA failed to comply with certain state ARARs. Thus, it is entitled to intervene under 42 U.S.C. § 9621(f)(2)(B). As to the State's claim that it is entitled to *de novo* review, section 9621(f)(2)(B) provides that the EPA's decision will be upheld if there is substantial evidence in the administrative record to support the EPA's decision. Thus, Congress contemplated that judicial review would be limited to the administrative record. There are, however, limited circumstances when *de novo* review of an agency's decision is authorized. *"[D]e novo* review is authorized when the action is adjudicatory and the agency fact finding procedures are inadequate." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). There may also be "independent fact finding when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action." *Id.* Thus, if the state can establish that the EPA's fact finding procedures were inadequate, *de novo* review would be proper. Nevertheless, the State has not established, nor presented evidence to establish, that the EPA did not follow appropriate agency procedures.[4]

■ In Count Four of its proposed complaint, the State of Michigan seeks its response costs and damages for the loss of natural resources at the Rose Township site under 42 U.S.C. § 9607. Both the United States and the defendants admit that the State is entitled to assert a claim for these monetary damages. Accordingly, this Court finds that Count Four states a viable cause of action, but, because this claim need not be joined in this action, this Court declines to complicate this case with that issue.

■ Under Counts Five through Seven, the State of Michigan seeks to pursue relief under Michigan's Water Resources Commission Act, M.C.L.A. § 323.6; Michigan's Environmental Protection Act, M.C.L.A. § 691.1201 et seq.; and the common law of public nuisance. Both the United States and the defendants contend that CERCLA preempts all inconsistent state law remedies. The State disagrees. It contends that the requirements for state participation in the EPA remedy selection process are supplementary to, not a substitute for, the State's continued right to enforce its environmental standards.

■ Preemption can occur in three instances: when Congress, while acting within constitutional limits, preempts state law by stating so in express terms; when the federal regulation is sufficiently comprehensive to make it reasonable to infer that Congress left no room for supplementary state regulation; and, in those areas where Congress has not completely displaced state regulation, federal law may preempt

---

4. Although the State contends that the EPA has not formulated a remedial action plan that conforms with the State's anti-degradation law, the State has not presented evidence that indicates that the EPA failed to follow the appropriate administrative procedures. The State asserts that the EPA failed to follow the appropriate administrative procedures when it did not consider Michigan's anti-degradation law to be an ARAR. The State, however, has failed to designate any portions of the record that establish that the EPA failed to consider the anti-degradation law to be an ARAR. Moreover, as discussed in the text of this Opinion, the State's contentions that the EPA failed to consider the anti-degradation law to be an ARAR are irrelevant because the consent decree attains the requirements of the State's anti-degradation law.

state law to the extent that the state law actually conflicts with the federal law. *California Federal Savings & Loan Ass'n. v. Guerra,* 479 U.S. 272, 280–81, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987).

The United States and the defendants admit that CERCLA does not expressly preempt state law and acknowledge that it is not sufficiently comprehensive to impliedly preempt state law. They do contend, however, that CERCLA preempts state law to the extent it conflicts with the remedial provisions of CERCLA.

When determining whether a federal law preempts a state law, a court must ascertain the intent of Congress. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2899, 77 L.Ed.2d 490 (1983). All of the parties refer this Court to the legislative history of CERCLA to provide evidence of congressional intent. That history, however, gives interpretations of the statute that conflict with each other. Compare the comments of Representative Eckert, 132 *Cong. Rec.* H9574 (daily ed. Oct. 8, 1986), with comments of Senator Mitchell, 132 *Cong. Rec.* S14,917 (daily ed. Oct. 3, 1986). Thus, the resolution of this issue must be accomplished through an examination of the mechanics of the statute. An analysis of these mechanics reveals that Congress intended CERCLA to preempt state claims to the extent that they are in conflict with the federal statute.

Under 42 U.S.C. § 9621(f), the states are permitted to become involved in any negotiations between the EPA and the PRPs, and may encourage the EPA to consider any state ARARs; however, the EPA "may conclude settlement negotiations with the potentially responsible parties without the State's concurrence." 42 U.S.C. § 9621(f)(2)(C). Thus, Congress specifically intended that the State's involvement in the settlement of clean-up liability would be limited to an advisory capacity and did not anticipate that the states would be able to impose their own requirements upon the PRPs in addition to the EPA's settlement. This is especially true in light of 42 U.S.C. § 9622.

Under 42 U.S.C. § 9622, Congress enacted a procedure by which the President, through the EPA, could pursue settlements with potentially responsible parties. Clearly, the enactment of such a statute evidences a legislative perception that the settlement of clean-up claims with potentially responsible parties is a worthwhile pursuit. To permit the State to supplement the settlement in a manner inconsistent with section 9621, by imposing additional remedial action requirements upon the settling parties, would impede the EPA's ability to resolve clean-up problems through settlement. Congress certainly did not intend this result.

Moreover, in the present case, to permit the State to pursue its claims in addition to the relief obtained by the EPA in its Consent Decree—assuming the Consent Decree is entered—would result in the defendants' inability to comply with both state and federal requirements. If the EPA's Motion to Enter the Consent Decree is granted, the defendants would be obligated to clean up the site by using a soil flushing method. If the State's relief is also granted, the defendants would be obligated to excavate and incinerate the contaminated soil. To require the defendants to conduct two different clean-up procedures on the site is inconsistent and supports this Court's determination that the federal remedies must preempt the state law claims. Accordingly, Counts Five through Seven of Michigan's proposed complaint do not state a viable cause of action because they are preempted by CERCLA.

In conclusion, the State of Michigan's Motion to Intervene is Granted and the State is permitted to intervene to assert the claims it raises in Count Three of its proposed complaint.

### III. THE EPA'S MOTION FOR ENTRY OF CONSENT DECREE

The Consent Decree is in two parts: the actual Consent Decree and an appended remedial action plan.

The Consent Decree contemplates that the initial remedial action work is to be performed by the defendants and, after

target contaminant levels are met, the EPA will become responsible for the completion of the clean up at the site. To that end, the Consent Decree requires the defendants create an interest-bearing trust account, which will be used to support the EPA's operation of the site after it assumes responsibility for the final clean up.

The defendants' remedial action work is to be performed under the direction of a qualified EPA-approved consultant. The defendants are required to develop a work plan, subject to the EPA's approval, that implements the remedial action within designated time frames. The EPA is required to review the remedial action at the facility at least every five years to assure that human health and environment are being protected by the action implemented and is permitted to seek further response action from the defendants if it determines that supplemental remedies are necessary. In addition to the periodic inspections by the EPA, the settling defendants are required to provide the EPA with monthly progress reports and are subject to stipulated fines for failure to timely provide the progress reports or for delays in implementation of the proposed remedial action. In consideration of the defendants' action, the EPA has agreed to a limited waiver of its right to sue the settling defendants for additional claims in connection with the Rose Township site.

The Consent Decree also incorporates the Remedial Action Plan, which requires the defendants to perform the following tasks:

1. Construct and maintain a six foot chain link fence;

2. Implement supplemental hydrogeologic studies regarding well placement, aquifers, permeability and porosity of unsaturated soil, placement of water extraction systems and characteristics of soil;

3. Install and maintain a ground water monitoring program;

4. Excavate and incinerate all soils at the site containing contractions of PCBs at or above 10 milograms per kilogram of soil;

5. Treat and bury soils containing lead greater than 70 milograms per kilogram of soil;

6. Install and maintain a ground water extraction/treatment system that includes air stripping and carbon adsorption;

7. Prepare and submit for EPA approval a laboratory work plan to determine whether soil flushing will meet phase I water target contaminant levels in the flushate, to help establish soil target contaminant levels, to obtain sufficient information to design a soil flushing system, and to determine whether soil flushing will meet target levels within ten years after the flushing is implemented;

8. Install and maintain a soil flushing system designed to remedy subsurface soil contaminated with VOCs and SVOCs and, if the system is determined to be ineffective, to submit within six months a proposal for further remedial action; and

9. Locate and treat wetlands on the site that contain PCBs in concentrations greater than 10 milograms per kilogram.

■ Although the State and the EPA disagree as to whether the Consent Decree meets all federal and state ARARs, this Court's review of the Consent Decree is limited to an examination of the administrative record. Pursuant to 42 U.S.C. § 9613(j), judicial review of any issues concerning the adequacy of any response action is limited to the administrative record and the response action will be upheld unless the Court finds that the selected response was arbitrary, capricious, or otherwise not in accordance with the law. Moreover, when a state contends that a remedial action does not attain federal or state ARARs, 42 U.S.C. § 9621(f)(2)(B) limits judicial review to determining whether there is substantial evidence in the record to support the EPA's decision. Thus, this Court is "not empowered to substitute its judgment for that of the agency." *Citizens of Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

Because this Court's review is limited to the administrative record, the affidavit of Robert Hayes, which the State submitted with its brief, will not be considered. That affidavit discusses the geophysical tests of the Rose Township site that were conducted in March of 1989. Those tests are not part of the administrative record. That information should have been obtained and developed for the EPA's initial decision-making, not for judicial review of the EPA's decision. *Association of Pacific Fisheries v. EPA*, 615 F.2d 794, 817 (9th Cir.1980). As the Tenth Circuit stated in *New Mexico Environmental Improvement Division v. Thomas*, 789 F.2d 825, 834 (10th Cir.1986), the "EPA cannot be held to a standard which requires it to consider after the fact information."

■ In the same vein, the May 1, 1989, memorandum of Basil Constantelos, which the EPA included in the administrative record, also will not be considered. It was drafted over three months after the EPA amended the Record of Decision. The EPA strongly urges that this memorandum is nothing more than a further articulation of the EPA's decision and not a post hoc rationalization. Although this Court recognizes that further articulations of an agency decision can be reviewed by the Court, they are often given less deference than documents published contemporaneously with the agency's action. *See e.g., Clement v. Securities Exchange Commission*, 674 F.2d 641, 646 (7th Cir.1982). In the present case, the Constantelos memorandum was drafted well after the State of Michigan indicated it would oppose the EPA's selection for remedying toxic waste. Under these circumstances, the Court elects to give the Constantelos memorandum absolutely no deference and does not consider it to be a legitimate part of the record.

Also of preliminary importance is that CERCLA assumes a proposed remedial action to be lawful, fair, and reasonable. Thus, the burden is on the party opposing the Consent Decree to demonstrate that the selected remedy is arbitrary, capricious, contrary to law, or based upon insubstan-

tial evidence in the administrative record. 42 U.S.C. § 9613(j); 42 U.S.C. § 9621(f)(2)(B). In this regard, the State of Michigan and the amici curiae have raised objections that can be grouped into three assertions:

1. that the Consent Decree is not in accordance with law;

2. that the Consent Decree is arbitrary and capricious; and

3. that the Consent Decree is neither fair nor reasonable.

## A. WHETHER THE PROPOSED REMEDY IS IN ACCORDANCE WITH THE LAW

The first challenge to be addressed is the State's and Amici Curiae claim that the proposed remedy is not in accordance with the law. They assert that the remedy violates 42 U.S.C. § 9621 because the remedy does not meet the State's ARARs. Under CERCLA, the remedial action must comply with an identified state ARAR unless the ARAR is waived. The statute provides, in relevant part:

[W]ith respect to any hazardous substance that will remain onsite if ... any promulgated standard, requirement, criteria, or limitation under a State environmental ... law is legally applicable to the hazardous substance or pollutant or contaminant concerned or is relevant and appropriate under the circumstances ..., the remedial action selected ... shall require, at the completion of the remedial action, a level or standard of control for such hazardous substance or pollutant or contaminant which at least attains such legally applicable or relevant and appropriate standard, requirement, criteria, or limitation.

42 U.S.C. § 9621(d)(2)(A). Under 42 U.S.C. § 9621(d), a state environmental requirement constitutes a state ARAR to which the remedy must comply if it is (1) properly promulgated, (2) timely identified, (3) more stringent than federal standards, and (4) legally applicable or relevant and appropriate. 42 U.S.C. § 9621(d).

■ The State and the amici curiae contend that the Michigan Water Resources

Commission Act, M.C.L.A. § 322.1, *et seq.*, and its corresponding agency rules, Mich. Admin.Code R. 323.2201 (1980), *et seq.*, are ARARs that must be attained by the remedy.

The Michigan Water Resources Commission Act is Michigan's water pollution law enacted to protect and conserve the water resources of the state and to prohibit the pollution of any waters in the state. Section 6(a) of the statute provides, in part:

> It shall be unlawful for any persons directly or indirectly to discharge into the waters of the state any substance which is or may become injurious to the public health, safety or welfare; or which is or may become injurious to domestic, commercial, industrial, agricultural, recreational or other uses which are being or may be made of such waters....

M.C.L.A. § 323.6(a). The corresponding agency rulings provide for the nondegradation of ground water in usable aquifers. Mich.Code R. 323.2205 (1980). Together they will be referred to as Michigan's ground water anti-degradation law.

The State and amici curiae maintain that these statutes and agency rules satisfy each of the criteria for ARARs to which a remedy must comply under 42 U.S.C. § 9621(d).[5]

To be considered an ARAR, the anti-degradation law must be properly promulgated. 42 U.S.C. § 9621(d)(2)(A)(ii). The term promulgated has been defined, in reference to this statute, to mean "laws imposed by State legislative bodies and regulations developed by State agencies that are of general applicability and are legally enforceable." Environmental Protection Agency, *Superfund Program; Interim Guidance on Compliance with Applicable or Relevant and Appropriate Requirements; Notice of Guidance*, 52 Fed.Reg. 32495, 32498 (Aug. 27, 1987) [Hereinafter *Interim Guidance*].

It is evident that the Michigan anti-degradation law was enacted by the Michigan legislature and that the accompanying administrative rules were properly developed by the Michigan Water Resources Commission. The settling defendants, however, contend that because the law provides no quantifiable standard, it is not legally enforceable and cannot be uniformly applied.

Although the state law does not contain specific numerical standards, it is, as the State contends, legally enforceable and of general applicability. The EPA's own publication recognizes that general requirements having no specific numerical standards can be enforceable ARARs:

> General State goals that are duly promulgated (*such as a non-degradation law*) have the same weight as explicit numerical standards, although the former have to be interpreted in terms of a site and therefore may allow more flexibility in approach.

*Interim Guidance*, at 32498 (emphasis added). Moreover, the EPA's own proposed rules state:

> General State goals that are contained in a promulgated statute and implemented via specific requirements found in the statute or in other promulgated regulations are potential ARARs. For example, a State antidegradation statute which prohibits degradation of surface waters below specific levels of quality or in ways that preclude certain uses of that water would be a potential ARAR. Where such promulgated goals are general in scope, e.g., a general prohibition against discharges to surface waters of "toxic materials in toxic amounts," compliance must be interpreted within the context of implementing regulations, the specific circumstances of the site, and

---

**5.** The State considers the anti-degradation law to be both a soil ARAR and a ground water ARAR. The statute and rules, however, make no reference to the protection of soil. Moreover, the State's anti-degradation law was not timely identified to the EPA as a soil ARAR. The first reference to the anti-degradation law as a soil ARAR was made in the State's response to the EPA's Motion for Entry of a Consent Decree. Accordingly, this Court finds that the State's anti-degradation law is not a soil ARAR. The remainder of the discussion will analyze the anti-degradation law as a potential ground water ARAR.

the remedial alternatives being considered.

Environmental Protection Agency, *National Oil and Hazardous Substances Polution Contingency Plan; Proposed Rule*, 53 Fed.Reg. 51394, 51438 (Dec. 21, 1988) (to be codified at 40 C.F.R. Part 300) [Hereinafter *Proposed Rule* ]. Thus, although the anti-degradation law has no specific numerical requirements, it was properly enacted by the Michigan legislature and Michigan Water Resources Commission and is generally applicable and legally enforceable. Accordingly, this Court finds that the Michigan ground water anti-degradation law is properly promulgated.

This Court also finds that the anti-degradation law, as the State contends, was timely identified to the EPA as a potential ARAR. It was identified as an ARAR in the RI/FS Report, the 1987 Record of Decision, the Responsiveness Summary, and the State's Comments on the Proposed Consent Decree. Therefore, the law was identified "in sufficient time to avoid inordinate delay or duplication of effort in the remedial process." *Interim Guidance*, at 32498.

■ Section 9621(d)(2)(A)(ii) requires the remedial action plan attain only state standards that are more stringent than federal standards. The defendants contend that the federal standards on the Safe Drinking Water Act, 42 U.S.C. § 300f, *et seq.*, are more stringent than Michigan's anti-degradation law and, therefore, supersede and render irrelevant Michigan's law.

Michigan's regulations provide that the quality of ground water in all usable aquifers shall not be degraded from local background ground water quality as the result of a discharge, unless a variance is obtained. Mich.Admin.Code R. 323.2205 (1980). Although it is difficult to compare a federal statute containing specific requirements with a state agency rule that contains a broad prohibition, this Court finds that the broad prohibition is more stringent than the federal statute setting minimal standards. Accordingly, Michigan's anti-degradation law also complies with this aspect of 42 U.S.C. § 9621(d).

The defendants' reliance on *Kelly v. United States*, 618 F.Supp. 1103 (W.D. Mich.1985), is of no avail. In that case, the district court found that Michigan's anti-degradation law did not provide objective, quantifiable standards subject to uniform application such that it could constitute a state pollution "requirement" for the purpose of waiving federal sovereign immunity under the Water Pollution Control Act, 33 U.S.C. § 1323. Aside from the fact that the district court was strictly construing a federal statute that waives sovereign immunity—to which federal consent must be clearly expressed—section 9621(d) does not require objective quantifiable standards that are subject to uniform application. The EPA's own guidelines suggest that such general standards be interpreted within the context of the implementing regulations and the specific circumstances of the site. *Proposed Rule*, at 51438.

■ The final requirement under section 9621(d) is that the state requirements be legally applicable or relevant and appropriate. In this regard, it is evident that the administrative rules prohibit the degradation of ground water as a result of a discharge. Mich.Admin.Code R. 323.2205 (1980). Moreover, the regulations define discharges to be "the addition of materials to ground waters from any facility or operation which acts as a discreet or diffuse source." Mich.Admin.Code R. 323.2202(j) (1980). Thus, because soil flushing diffusely discharges toxicants from the soil into the ground water, the anti-degradation rules are legally applicable to the clean up of the Rose Township site.

■ The defendants contend that the anti-degradation laws are vague and unenforceable. To the contrary, the rules are drafted with sufficient specificity to ensure that ordinary people understand what conduct is prohibited and to avoid arbitrary and discriminatory enforcement. Consequently, the rules satisfy constitutional requirements. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Fowler v. Board of Education*, 819 F.2d 657, 664 (6th Cir.1987).

Therefore, with respect to 42 U.S.C. § 9621(d), Michigan's ground water anti-degradation law is a ground water ARAR to which the proposed remedy must comply. It is properly promulgated; timely identified; more stringent than the federal standard; and legally applicable. The ground water anti-degradation law is not, however, a soil ARAR. The statute and administrative rules do not refer to soil degradation and they were not timely identified as a soil ARAR.

■ Determining that Michigan's anti-degradation law is a state ARAR, however, does not resolve whether the proposed consent decree violates 42 U.S.C. § 9621. This Court must also determine whether the proposed remedial action complies with the anti-degradation law, for if it does comply—and the Court recognizes that the Amended Record of Decision asserts that it complies with all state and federal ARARs—then the State's challenges are without merit. Only if this Court determines that the proposed remedial action violates the ARAR can it hold that the remedial action plan is contrary to the law of section 9621.

The State of Michigan contends that the Consent Decree does not meet the State ARAR because the complex geophysical conditions of the site will render soil flushing an ineffective means of treating ground water degradation and will frustrate attempts at evaluating the success of the soil flushing remedy. Moreover, the State asserts that the method for pilot testing that is to be performed before soil flushing is implemented and the remedy to be used if soil flushing fails have not been defined in the record of the Consent Decree and, because of the geology of the site, will be unreliable. Finally, the State challenges provisions of the Consent Decree, which vests the defendants with the responsibility of defining the target contaminant levels of the soil, because the geologic conditions of the site will impede the defendants' ability to obtain representative data.

As to the State's assertion that the complexity of the geology render soil flushing and testing ineffective, the EPA and the settling defendants contend that the conditions of the site are not as complex as first considered and, in any event, the geology and the effectiveness of the remedy is a matter upon which experts can differ, but not subject to judicial intervention unless the agency's decision is arbitrary and capricious.

Although there is evidence that a relatively impermeable layer of clay found at 75 to 145 feet below ground surface limits the downward migration of water at the site (RI/FS at 36), there is also substantial evidence in the record that supports the EPA's finding that the site is conducive to soil flushing (RI/FS at figures 5-4, 5-5, 5-7, 5-8) and that soil flushing is naturally occurring since VOCs are already being found in the ground water (Explanation of Plan Differences). Thus, this Court finds that the ARAR is not violated by the Consent Decree's use of soil flushing and the procedures used to evaluate the soil flushing.

■ The State's contention that the means of pilot testing and the remedies to be used if soil flushing fails are not adequately defined is also without merit. It is legally acceptable to leave aspects of a remedial action plan open for further determination. For example, in *United States v. Hooker Chemicals and Plastics Corp.*, 540 F.Supp. 1067 (W.D.N.Y.1982), the court approved a consent decree, over objections, which provided a remedy that was left for future resolution. Moreover, there are sound justifications for leaving aspects of a remedy open for future determination. The science of remedying and evaluating toxic waste, like all sciences, is constantly evolving. To require the defendants and the EPA to select a remedy if soil flushing proves to be ineffective, without the aid of knowing how the soil conditions have changed, is unreasonable and would preclude the implementation of new methods of clean up that are not yet discovered.

Finally, as to the State's concerns that the target contaminant levels have not yet been set, these levels will be developed, subject to the EPA's approval, after the

defendants have had an opportunity to more fully analyze the site.

In this analysis of whether the Consent Decree complies with the State ARAR, the Court recognizes that the purpose of Michigan's ground water anti-degradation law is to protect and conserve the State's water resources. This is consistent with the goal of the remedy selected for the site; the Consent Decree's purpose is to protect health and environment. Moreover, soil flushing is not a per se violation of the anti-degradation law for two reasons. First, the State has approved the use of soil flushing in Niles, Albion, and Greenville, Michigan. Thus, the State recognizes that soil flushing is not a per se violation of the anti-degradation law. Second, whether the Consent Decree complies with the state ARAR is to be measured at the completion of the remedy. 42 U.S.C. § 9621(d)(2)(A). Consequently, this Court is unable to determine with any certainty whether the Consent Decree will attain the requirements of the state ARAR. Only when the remedy is completed will such a determination be possible. If at that time the State has evidence that the applicable ARARs have not been attained, it can assert a claim under 42 U.S.C. § 9621(e)(2).

Therefore, although the Michigan ground water anti-degradation law is a governing ARAR, the Consent Decree does not, at this time, violate it. Because of the conditions of the site and the remedy selected, determinations of whether the remedy complied with the ARAR can only be made at the completion of the remedy. Accordingly, this Court finds that the proposed Consent Decree is not contrary to the law of 42 U.S.C. § 9621, as claimed by the State of Michigan.[6]

## B.  WHETHER THE PROPOSED REMEDY IS ARBITRARY AND CAPRICIOUS

■■■ As previously noted, under 42 U.S.C. § 9613(j), this Court must uphold the Consent Decree unless it is contrary to law, or arbitrary and capricious. Having found that the Consent Decree is not contrary to law, a determination as to whether it is arbitrary and capricious must be made. The State contends that the proposed Consent Decree is arbitrary and capricious for several reasons.

The State contends that the EPA's determination that soil flushing will attain all ARARs is not supported by the record because the evidence in the record strongly supports the EPA's initial decision in the 1987 Record of Decision to reject soil flushing and the circumstances that the EPA listed as the basis for reopening the Record of Decision never materialized. Specifically, the State claims that the EPA never determined that ground water could not be discharged into the marshes and would have to be reintroduced into the ground water system. Moreover, the State maintains that the EPA only reviewed three of the eight factors it listed as necessary to consider before reopening the Record of Decision.

■■■ Although the EPA never determined that ground water could not be discharged into the marshes, as it required in the 1987 Record of Decision, the EPA clearly contemplated reopening the decision

6. The State has filed a Motion for Rehearing with regard to this aspect of the Court's ruling. In its motion, the State contends that the record contains no factual basis or a determination that the remedy selected will attain, at the completion of the remedy, the level or standard of control provided for in the anti-degradation law.

This is incorrect. The Amended Record of Decision states that the selected remedy meets all state and federal ARARs. Moreover, as indicated in the opinion, there is substantial evidence in the record that supports EPA's determination that soil flushing will effectively remove the toxic waste from the site.

Furthermore, the burden is on the State to establish that the selected remedy does not comply with a state or federal ARAR. 42 U.S.C. § 9621(f)(2)(B). The State has not met this burden. It has not designated any portions of the record that establish that the EPA failed to consider the anti-degradation law to be an ARAR and it has not designated any portions of the record that establish that the selected remedy fails to attain the standards set forth in the Michigan anti-degradation law.

Accordingly, the State's Motion for Rehearing is DENIED.

if soil flushing was found to be practical. Thus, the public was put on notice that soil flushing was to be examined. Moreover, the EPA is not estopped by its prior decision from altering its methodology for making decisions or from altering the actual decisions. Section 9617(c) provides a procedure whereby the EPA can change its decision as to a remedial action plan if it provides adequate explanations for the change. Furthermore, an administrative agency should not be estopped by its prior precedent from altering its decisions as a result of increased expertise. *See, e.g., State of Michigan v. Thomas,* 805 F.2d 176, 184–85 (6th Cir.1986).

Thus, because the EPA, in the Proposed Settlement Plan Explanation and the Amended Record of Decision, adequately explained its decision to select soil flushing for the Rose Township site, this Court cannot say that the EPA's remedy selection was arbitrary and capricious. After further studies had been conducted, the increased information in the record provided substantial evidence to support the decision that soil flushing is an effective remedy.

The State also contends that the selection of soil flushing is an arbitrary and capricious decision because the record establishes that the complex geology at the site renders soil flushing ineffective and difficult to analyze.

As previously noted, however, there is substantial evidence in the record to support the EPA's decision to select soil flushing. There is evidence that the site is conducive to soil flushing and that it is naturally occurring. Thus, this Court cannot find that the EPA's selection of soil flushing as the clean-up method is arbitrary and capricious.

## C. WHETHER THE PROPOSED REMEDY IS FAIR AND REASONABLE

■ The State's final challenge to the proposed Consent Decree is that it is neither fair nor reasonable. The State requests this Court reject the remedy because the Consent Decree does not assure effective remediation of the soil, that it

contemplates the possibility of a soil flushing and extraction system in place for seventy-five years, and that it unfairly places the risk of completing the remedial action upon the public through the EPA rather than the settling defendants.

In this Court's considered judgment, the settlement is fair and reasonable. Contrary to the State's assertion, the Consent Decree does assure the effective remediation of the soil. Under the remedial action plan, the defendants are obligated to propose an alternative remedy to soil flushing within six months after the EPA determines that soil flushing is ineffective. Moreover, once the alternative remedy is selected—and the State does have an input on the selection process—the defendants are obligated to implement the newly selected remedy. Thus, regardless of the effectiveness of soil flushing, the site will be remedied to certain specifications. Therefore, the Consent Decree assures the effective remediation of the soil.

The State suggests that soil flushing and extraction systems may be in place for as long as seventy-five years. That time period is found in the record within a cost estimate analysis developed by Fred C. Hart and Associates. Read in context, the cost analysis indicates that the trust fund will enable the EPA to continue operating the ground water extraction and soil flushing systems for seventy-five years. It does not indicate that those systems will be needed for that length of time. The more common estimate of time required for soil flushing is ten to fifteen years. Although this is seven to twelve years longer than the time necessary for soil incineration, the record supports the EPA's determination that this is not an unreasonable difference in time when compared to the cost savings and the potential dangers of dust and ash exposure that are associated with soil incineration.

Finally, the State's concerns with the public bearing the cost of the clean up are unfounded. The cost analysis performed by Fred C. Hart and Associates indicates that the trust fund will support long term clean up remedies if required. Moreover,

the EPA is entitled to, and is proceeding against, the non-settling defendants to obtain additional funds to be used to remedy the site. Furthermore, although there is a risk that the EPA may incur some expenses in the remediation of the site, the risk is reasonable when compared to the complexity of the site and the need to commence removal of the toxic waste.

Accordingly, this Court finds that the proposed Consent Decree is fair and reasonable.

## IV. CONCLUSION

In conclusion, for the foregoing reasons, the State of Michigan's Motion to Intervene is GRANTED with respect to Count Three of its proposed complaint. The United States' EPA's Motion for Entry of a Consent Decree is GRANTED and the State of Michigan's Motion for Rehearing on the Motion for Entry of the Consent Decree [7] is DENIED.

Let judgment enter accordingly.

So ordered.