STATE OF COLORADO,
Plaintiff–Appellee,

v.

IDARADO MINING COMPANY, et al.,
Defendants–Appellants and
Third–Party Plaintiffs,

v.

BAUMGARTNER OIL COMPANY, et
al., Third–Party Defendants.

Nos. 89–1077, 89–1326, 89–1344
and 90–1129.

United States Court of Appeals,
Tenth Circuit.

Oct. 11, 1990.

James D. Ellman, Asst. Atty. Gen., CERCLA Litigation Section (Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., & Michael R. Hope, Deputy Atty. Gen., CERCLA Litigation Section, with him on the brief), State of Colo., Denver, Colo., for plaintiff-appellee.

Nancy C. Shea, Shea & Gardner, Washington, D.C. (James R. Bieke, Michael S. Giannotto & Paula A. Sweeney, Shea & Gardner, Washington, D.C. and Christo-

pher Lane & Cassandra G. Sasso, Sherman & Howard, Denver, Colo., with her on the brief), for defendants-appellants and third-party plaintiffs.

Richard B. Stewart, Asst. Atty. Gen., David C. Shilton & Dirk D. Snel, Attys., Land and Natural Resources Div. Appellate Section, Dept. of Justice, and Charles Openchowski, Office of the General Counsel & Nancy Mangone, Office of Enforcement and Compliance Monitoring, U.S.E.P.A., Washington, D.C., for the U.S., amicus curiae.

Before McKAY, ANDERSON and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

Defendants-appellants Idarado Mining Company, Newmont Mining Corporation, and Newmont Services Limited appeal from a mandatory injunction issued by the district court on February 22, 1989. Plaintiff-appellee State of Colorado (State) is the beneficiary of the injunction, issued on the authority of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9626, as amended by the 1986 Superfund Amendments and Reauthorization Act (SARA), Pub.L. No. 99–499, 100 Stat. 1613 (1986). Subsequent to the issuance of the injunction, the district court entered judgment in favor of the State for past response costs plus prejudgment interest. *State of Colorado v. Idarado Mining Co.,* 735 F.Supp. 368 (D.Colo.1990). That interlocutory order is not the subject of this appeal. *See* Appellants' Motion for Consolidation at 3 (filed May 10, 1990).

The injunction issued on the authority of § 121(e)(2) of CERCLA, 42 U.S.C. § 9621(e)(2), directs appellants to carry out an extensive environmental cleanup plan proposed by the State and adopted, with various modifications, by the district court. *See Colorado v. Idarado Mining Co.* 707 F.Supp. 1227, 1232, 1261–63 (D.Colo.1989), *amended in part,* 735 F.Supp. 368 (1990). In December 1989, a three-judge panel of this court stayed the injunction pending appeal. *See* Fed.R.App.P. 8(a); 10th Cir.R. 8.1. The district court's jurisdiction arose under 28 U.S.C. § 2201 and § 113(b) of CERCLA, 42 U.S.C. 9613(b); our jurisdiction to consider the appeal from the district court's grant of an injunction arises under 28 U.S.C. 1292(a)(1).

## I.

As enacted in 1980 and amended in 1986, CERCLA was designed to facilitate cleanup of environmental contamination caused by releases of hazardous substances. The act sets forth several mechanisms for responding to such releases and delineates the respective powers of the federal government, the states, Indian Tribes and private parties. Section 111 of CERCLA provides for the creation of a Hazardous Substance Superfund to finance cleanup actions at sites affected by releases or threatened releases of hazardous substances. 42 U.S.C. § 9611. Section 104(a) authorizes the federal government to take necessary cleanup actions financed by the Superfund to respond to such releases or threatened releases. 42 U.S.C. § 9604(a). Alternatively, under § 104(d), the federal government may enter into cooperative agreements with states, political subdivisions or Indian Tribes to conduct cleanup actions using the Superfund. 42 U.S.C. § 9604(d).

To shift the financial burden of a cleanup to the parties responsible for the releases, a governmental entity may sue these parties for the costs incurred in responding to a release. CERCLA § 107(a); 42 U.S.C. § 9607(a). In such a cost recovery action, responsible parties include, among others, the "owner or operator" of the facility from which the release occurred. *Id.* Even when no cooperative agreement exists permitting use of Superfund money for cleanup, CERCLA § 114(a) preserves the right of a state or other party to proceed under applicable state law to conduct a cleanup of a site affected by hazardous substances. 42 U.S.C. § 9614(a). States or other parties which incur response costs not financed by the Superfund may bring a cost recovery action against the responsible parties. 42 U.S.C. § 9607(a).

When a cost recovery action is brought by the federal government, a state, an Indian Tribe or a private party, § 107(a)(4) imposes liability on responsible parties for response costs "not inconsistent with the national contingency plan [NCP]." 42 U.S.C. § 9607(a)(4). The NCP consists of procedural and substantive guidelines issued by the Environmental Protection Agency (EPA) governing CERCLA cleanup actions. *See* 40 C.F.R. pt. 300 (1989). Liability among responsible parties is joint and several, *O'Neill v. Picillo*, 883 F.2d 176, 178–79 (1st Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990), and one responsible party may seek contribution from other responsible parties, 42 U.S.C. 9613(f).

In addition to the authority to finance cleanups from the Superfund and to recover costs from responsible parties, CERCLA provides the federal government with additional power to deal with releases of hazardous substances by bringing an abatement action in federal district court. *See generally Koppers Indus., Inc. v. United States EPA*, 902 F.2d 756, 757 n. 1 (9th Cir.1990) (discussing federal options); *United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F.Supp. 437, 441 (D.Kan.1990) (same). If the President determines that a release or threatened release may pose "an imminent and substantial endangerment to the public health or welfare or the environment," § 106(a) provides that the federal government may seek "such relief as the public interest and the equities of the case may require." 42 U.S.C. § 9606(a). Such relief may include a mandatory injunction compelling responsible parties to perform a cleanup. *See, e.g., United States v. Conservation Chem. Co.*, 619 F.Supp. 162, 192 (W.D.Mo.1985). However, § 106(a) does not allow a state, with or without a cooperative agreement, to seek injunctive relief against responsible parties. *See* 42 U.S.C. § 9606(a). Whether that authorization is found elsewhere in CERCLA is the subject of this appeal.

## II.

This action relates to a cleanup of a highly mineralized area that has been pros-pected and mined extensively throughout the century. *Idarado*, 707 F.Supp. at 1234. According to the State, Idarado and its codefendants are responsible for various metallic releases in certain rivers and creeks located between the towns of Telluride and Ouray in southwestern Colorado. The sources of these releases are tailings piles, mine portals and waste rock piles. Tailings essentially are finely ground ore from which most of the valuable metal has been removed by the milling process. Because some metal remains, however, tailings piles release metal when water flows over or seeps through them. Portals are mine openings originally used for access to underground mines. Water entering a mine by seepage from the surface or by groundwater movement can pick up metals while flowing through mineralized materials underground and then exiting through the mine portals. Waste rock is material removed from a mine lacking sufficient metal content to warrant further processing. Like tailings, waste rock can release metals upon contact with water flows.

Idarado's properties are located in three areas. Two are in the Telluride and Red Mountain valleys, separated by the mountains in which Idarado's mine is located. The Telluride Valley property contains six tailings piles and two mine portals. *Id.* at 1233. The San Miguel River flows through Idarado's property, down the valley, and past the town of Telluride. The Red Mountain Valley property contains five tailings piles and several portals and waste rock piles. *Id.* Red Mountain Creek flows through the valley past Idarado's property and empties into the Uncompahgre River above the town of Ouray. The third property is known as the High Country, consisting of the mountain basins between the Telluride and Red Mountain Valleys. The parties have agreed in large part upon remediation for the High Country.

The State of Colorado initiated this action against Idarado, its parent company, Newmont Mining Corporation, and a subsidiary of the parent which had provided services to Idarado, Newmont Services Limited. The State's complaint, as amend-

ed, sought to hold the defendants liable for cleanup costs associated with the Idarado mining properties.[1] Following the enactment of SARA in 1986, the state further supplemented its pleadings to seek an injunction directing Idarado to cleanup the sites.

In March 1987, the State issued a Record of Decision (ROD) which contained its proposed plan for remedial activities to be undertaken at the sites. Thereafter, the district court ruled that Newmont Mining was an "owner and operator" of the Idarado facilities and that Newmont Services was an "operator" of those facilities because both entities "were involved directly in day-to-day operations of Idarado Mining Company and the sites here in dispute." *See Colorado v. Idarado Mining Co.*, 18 Envtl.L.Rep. (Envtl.L.Inst.) 20,578, 20,579 (D.Colo.1987); *see also United States v. Kayser–Roth Corp.*, 724 F.Supp. 15, 22 (D.R.I.), *aff'd*, 910 F.2d 24, 27 (1st Cir. 1990). Accordingly, Newmont Mining and Newmont Services, as well as Idarado Mining, were held liable under CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1).

During twenty-six trial days, the district court considered the testimony of over thirty witnesses and received over 1,000 documents into evidence. The record on appeal consists of sixty volumes and we obtained the pleadings below. Much of the evidence concerns the extent, if any, of environmental harm and whether the proposed remediation alternatives presented by the State and Idarado were technically feasible, cost-effective and consistent with the NCP. The district court determined that surface and ground water had been contaminated by releases from tailings, as evidenced by damage to the aquatic environment. *Idarado*, 707 F.Supp. at 1236–37, 1249, 1252, 1255. With various modifications, the district court determined the State's plan "effectively protects and minimizes threats to public health, welfare and the environment." *Id.* at 1261. Having declared the defendants liable for future cleanup activity under CERCLA § 107(a)(4)(A), the court entered a mandatory injunction requiring the defendants to execute the State's plan as modified. *Idarado*, 707 F.Supp. at 1262. The district court indicated that it would retain jurisdiction over the parties to insure full compliance with its order concerning remedial activities. *Id.* The district court also retains jurisdiction also to resolve the plaintiffs' pending claims for natural resource damage and defendants' third-party claims for contribution.[2]

### III.

On appeal, defendants contend that the district court (1) lacked authority under

---

1. The State's amended complaint also included pendent state law claims, but these were dismissed by the district court. The State also sought monetary recovery for damage to natural resources pursuant to CERCLA § 107(a)(4)(C). *See* 42 U.S.C. § 9607(a)(4)(C). Idarado filed third-party claims for contribution under CERCLA § 113(f), against certain other owners of mining facilities in the Red Mountain Valley. *See* 42 U.S.C. 9613(f). With the consent of the parties, the district court bifurcated the trial into two consecutive phases: a remedy/response cost phase and a natural resource damage phase. *See* Fed.R.Civ.P. 42(b); *State of Colorado v. Idarado*, No. 83–C–2385, Order Bifurcating Trial at 1–2 (D.Colo. filed Apr. 20, 1987). The district court also severed Idarado's third-party claims for contribution. The natural resource damage phase and the contribution phase have yet to take place.

2. In interlocutory appeals under 28 U.S.C. § 1292(b) and Fed.R.Civ.P. 54(b), the district court retains jurisdiction to act on matters not involved in the appeal. 9 J. Moore, B. Ward & B. Lucas, *Moore's Federal Practice* ¶ 203.11 (2d ed. 1990); *Garcia v. Burlington N. R.R. Co.*, 818 F.2d 713, 721 (10th Cir.1987). However, the district court is generally without jurisdiction to proceed when an interlocutory appeal is from the rejection of a double jeopardy defense or the denial of absolute or qualified immunity. *Stewart v. Donges*, 915 F.2d 572, 576–577 (10th Cir. 1990).

   Here, the interlocutory appeal under 28 U.S.C. § 1292(a)(1) is from the district court's grant of a mandatory injunction, thus, "the district court retains power to act on the case pending appeal." 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* § 3921 at 26 (1977). And the district "court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal." Fed.R.Civ.P. 62(c). *Accord* 9 *Moore's Federal Practice* ¶ 203.11 (appeal from the grant or denial of a preliminary injunction does not "divest the district court of jurisdiction to proceed with the action on the merits.").

CERCLA to grant the State injunctive relief, (2) made inadequate and unsupported findings of fact in deciding that the State's cleanup plan was "not inconsistent with" the NCP, (3) lacked authority to hold the defendants liable for the permanent relocation of the residents of a trailer park, (4) improperly held defendants liable for cleaning up Red Mountain Creek, (5) improperly held defendants liable for remediation of releases from certain mine portals, and (6) improperly held that the defendants Newmont Mining Corp. and Newmont Services Ltd. were owners or operators of defendant Idarado's facilities. We vacate the district court's injunction and remand on the basis of the first and third points. We decline to decide the remaining issues at this time because the district court will modify its relief based upon this opinion and various portions of the case, which could affect the phase just completed, have yet to be resolved. *See Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 757, 106 S.Ct. 2169, 2177, 90 L.Ed.2d 779 (1986) (discussing principles of pendent appellate jurisdiction in the injunction context); *Tri–State Generation & Transmission v. Shoshone River Power, Inc.,* 874 F.2d 1346, 1351–53 (10th Cir.1989) (same); *see also Hill v. Department of the Air Force,* 884 F.2d 1318, 1320 (10th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990) (on appeal from denial of qualified immunity, court considered merits of non-immunity issue); *Dube v. State Univ.,* 900 F.2d 587, 598–600 (2d Cir.1990) (same).

### A.

■ Defendants argue that even if we decide that the district court lacked authority to issue the mandatory injunction, we should exercise pendent appellate jurisdiction over whether the State's plan is "not inconsistent with" the NCP because this issue is critical to the implementation of an appropriate remedy, regardless of *who* actually implements the remedy. Appellants' Brief at 41 n. 28. Without question, we have jurisdiction to consider those matters which are closely related to the grant or denial of the injunction. *Asset Allocation & Management v. Western Employers Ins. Co.,* 892 F.2d 566, 568–69 (7th Cir. 1989); *Tri–State,* 874 F.2d at 1351–52. We also have discretionary jurisdiction to consider "rulings that are related but not essential to the validity of the injunction." *Asset Allocation,* 892 F.2d at 569; *Tri–State,* 874 F.2d at 1352–53. Important factors which inform our discretion whether to exercise pendent appellate jurisdiction include (1) whether the otherwise nonappealable issue is sufficiently developed, both factually and legally, for our review, *Tri–State,* 874 F.2d at 1352, (2) whether review of the appealable issue involves consideration of factors closely related or relevant to the otherwise nonappealable issue, *McCowan v. Sears Roebuck & Co.,* 908 F.2d 1099, 1104 (2d Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 250, 112 L.Ed.2d 209 (1990); *Dube,* 900 F.2d at 598; *Tri–State,* 874 F.2d at 1352, and (3) whether judicial economy will be better served by resolving the otherwise nonappealable issue, notwithstanding the federal policy against piecemeal appeals, *see McCowan,* 908 F.2d at 1099 (although pendent appellate jurisdiction should be used sparingly, pendent review of otherwise nonappealable issue was "a wise and time saving exercise of ... discretion"); *Tri–State,* 874 F.2d at 1352 (not exercising pendent appellate jurisdiction over otherwise nonappealable issue that did not need further development of record would be a "waste of judicial resources").

### B.

This is a case in which the district court bifurcated the trial pursuant to Fed.R. Civ.P. 42(b), *see supra* n. 1; "[t]here is no final judgment until all of the issues have been resolved and judgment entered on the whole case." 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2392 (1971 & 1990 Supp.). This interlocutory appeal concerns the district court's authority to grant injunctive relief; our resolution turns on the construction of CERCLA §§ 121(e) and 101(24), rather than on the remaining issues raised by defendants under other provisions of CERCLA. Al-

though the defendants are confident that the district court will not reconsider its findings and conclusions on these remaining issues, *see* Appellants' Brief at 41 n. 28, we simply do not have before us a judgment which finally resolves the remedial issue consistent with liability permitted under the Act. Nor do we have before us the district court's interlocutory order awarding the State past response costs, which, in the interest of judicial economy, should be considered at the same time the State's plan (as modified) is evaluated for cost recovery.

Any appellate determination about whether the State's plan is "not inconsistent with" the NCP, is primarily factual, and in view of our resolution of the injunction issue, not closely related to the merits we must address. In *Tri–State*, we stated that "this court as a matter of law may justifiably, though cautiously, decide other generally nonappealable *legal* issues." 874 F.2d at 1352 (emphasis added). There, the district court determined as a matter of law that the buyer in a requirements contract did not have an implied obligation to remain in business and declined to grant a permanent injunction. On appeal, this court found an absence of irreparable harm which would support a permanent injunction, but nonetheless considered the merits of the contract issue, a legal issue involving contract interpretation. *Id.* at 1352–53. This court reversed the district court on its application of contract law, but declined to exercise pendent appellate jurisdiction over matters which involve the application of well-established legal standards of review (e.g. abuse of discretion, sufficiency of the evidence) to the trial evidence. *Id.* at 1353. Thus, although some issues were sufficiently well developed factually to review, *see Thornburgh*, 476 U.S. at 757, 106 S.Ct. at 2177, the court nonetheless declined to exercise pendent appellate jurisdiction over issues concerning remititur, new trial and judgment notwithstanding the verdict. *Tri–State*, 874 F.2d at 1353.

In points two (adequacy of district court findings whether State's plan is "not inconsistent with" the NCP) and four (whether defendants are liable for remediation of

Red Mountain Creek), the defendants are challenging in large part whether the district court's factual findings are supported by the record. These claims primarily concern application of the clearly erroneous standard of review to the voluminous record. *See* Fed.R.Civ.P. 52(a). We decline to exercise pendent appellate jurisdiction over these claims in the interest of judicial efficiency and consistency. These issues should be resolved when past response costs and any natural resource damages are considered. At that time, any subsequent factual findings will be before us. Resolving numerous fact-bound issues in a single appeal from a final judgment is in keeping with this court's concern with judicial efficiency.

Defendants' point five (whether releases from the Mill and Meldrum Tunnel mine portals constitute federally permitted releases which are exempt from CERCLA liability) and point six (whether Newmont Mining may be held liable as an "owner and operator" and Newmont Services as an "operator") do contain legal issues, however, our preliminary review of the district court's factual findings and legal conclusions and the record on appeal convince us that the factual issues predominate and are best resolved on appeal from a final judgment. In the exercise of our discretion, we decline to review all points but those most directly related to the injunctive relief. Hence, we decide defendants' points one and three at this time.

## IV.

■ The State's position concerning the authority of the district court to grant injunctive relief must be examined with reference to those courts which have considered this issue, legislative history and, most importantly, the language of the statute and its reasonable interpretation in light of CERCLA. CERCLA is a remedial statute and its provisions should be construed liberally, but with due regard for executive and legislative intent as reflected in the enactment process and the statute itself. *See Kayser–Roth*, 910 F.2d at 26;

*State of New York v. Shore Realty*, 759 F.2d 1032, 1045 (2d Cir.1985).

### A.

Prior to the amendment of CERCLA, several courts had rejected the position that injunctive relief was available to states and other non-federal plaintiffs. In *Shore Realty*, the Second Circuit rejected New York's claim that a district court has inherent or implied power to grant injunctive relief under § 107 of CERCLA in view of the express injunctive authority and accompanying standard for injunctive relief contained in § 106. 759 F.2d at 1049–50 (construing 42 U.S.C. §§ 9606, 9607). Section 106 specifically identifies the federal government as entitled to injunctive relief; allowing an injunction under § 107 (which is silent concerning injunctive relief) would render § 106's express language surplusage. *Shore Realty*, 759 F.2d at 1049. Moreover, the standard for obtaining relief in an abatement action under § 106 is narrower than that in a cost recovery action under § 107. Allowing injunctive relief to any § 107 plaintiff would conflict with § 106's narrower scope. *Shore Realty*, 759 F.2d at 1049. *Accord Conservation Chem. Co.*, 619 F.Supp. at 231–32; *Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 21 Env't Rep.Cas. (BNA) 1108, 1115–17 (C.D.Cal.1984), *aff'd in pertinent part*, 840 F.2d 691, 696–97 (9th Cir.1988); *Velsicol Chem. Corp. v. Reilly Tar & Chem. Corp.*, 21 Env't Rep.Cas. (BNA) 2118, 2121 (E.D. Tenn.1984). On appeal and below, the State concedes that, prior to the effective date of the SARA amendments in 1986, a state could not obtain injunctive relief under CERCLA requiring private defendants to implement a state cleanup plan.[3]

Courts have adhered to the view that injunctions are not available to states and other non-federal plaintiffs under CERCLA, even after the 1986 SARA amendments. *See Cadillac Fairview*, 840 F.2d at 696–97; *United States v. Cannons Eng'g Corp.*, 720 F.Supp. 1027, 1052 (D.Mass. 1989), *aff'd*, 899 F.2d 79 (1st Cir.1990); *United States v. Akzo Coatings*, 719 F.Supp. 571, 577–78 (E.D.Mich.1989); *McGregor v. Industrial Excess Landfill, Inc.*, 709 F.Supp. 1401, 1408–09 (N.D.Ohio 1987), *aff'd*, 856 F.2d 39 (6th Cir.1988); *State of Vermont v. Staco, Inc.*, 684 F.Supp. 822, 835 (D.Vt.1988); *Brewer v. Ravan*, 680 F.Supp. 1176, 1180 (M.D.Tenn. 1988); *Utah State Dep't of Health v. Ng*, 649 F.Supp. 1102, 1105–06 (D.Utah 1986).

### B.

■ The State argues that injunctive relief for states is now authorized by CERCLA § 121(e)(2), 42 U.S.C. 9621(e)(2) which provides in part:

> A State may enforce any Federal or State standard, requirement, criteria, or limitation to which the remedial action is required to conform under this Act in United States district court for the district in which the facility is located.

Section 121 of CERCLA, added by SARA, deals with cleanup standards applicable to federal cleanup actions, and with the rights of the states to participate in such federal remedial activities. Section 121(e)(2)[4] allows a state to insure that a remedy of

---

3. *See* State's Answer Brief at 5; Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss Plaintiff's Claims for Injunctive and Declaratory Relief to Enforce or Approve Its Remedial Action Plan at 9, No. 83–C–2385 (D.Colo. filed May 14, 1987), *incorporating* Plaintiff's Trial Memorandum § XIII at 150–51 (D.Colo. filed Apr. 20, 1987).

4. The section provides:
   A State may enforce any Federal or State standard, requirement, criteria, or limitation to which the remedial action is required to conform under this Act in United States district court for the district in which the facility is located. Any consent decree shall require

the parties to attempt expeditiously to resolve disagreements concerning implementation of the remedial action informally with the appropriate Federal and State agencies. Where the parties agree, the consent decree may provide for administrative enforcement. Each consent decree shall also contain stipulated penalties for violations of the decree in an amount not to exceed $25,000 per day, which may be enforced by either the President or the State. Such stipulated penalties shall not be construed to impair or affect the authority of the court to order compliance with the specific terms of any such decree.
42 U.S.C. § 9621(e)(2).

federal character will comply with substantive federal and state cleanup standards required of federal remedies under CERCLA.

The district court referenced § 121(e)(2) and concluded that "injunctive relief also is available to the State under CERCLA." *Idarado*, 707 F.Supp. at 1232. For the reasons that follow, we hold that the structure of CERCLA does not permit the injunctive relief granted in these circumstances, notwithstanding § 121(e)(2).

In a presentation that does not cultivate simplicity, the State reminds us that § 121(e)(2) allows a state injunctive relief "to enforce any requirement to which the remedial action is required to conform." Appellee's Brief at 6. According to the State, the standards, requirements, criteria, or limitations referred to in § 121(e)(2) include the requirements of CERCLA and the NCP, as well as applicable requirements of federal and state environmental law (ARARs).[5] Appellee's Brief at 6 (citing CERCLA 121(d); 40 C.F.R. 300.68(i)(1) & 300.71(a)(4) (1989)). The State then argues that it was required to integrate all ARARs described in the NCP regulations into its plan pursuant to 40 C.F.R. § 300.71(a)(4), and, therefore, should be granted an injunction to enforce such requirements. Appellee's Brief at 9. The State further argues, relying upon 40 C.F.R. § 300.68(e)(1), that because its cost recovery action under CERCLA § 107 was required to be "not inconsistent with" the NCP, the State's remedial action plan has incorporated NCP standards as well, and the State must be allowed injunctive relief to uphold NCP standards. Appellee's Brief at 9–11. Next, the State argues that when the district court approved the State's remedial action plan with minor modification, the State's plan became an additional requirement to which the remedial action was required to conform and, consequently, injunctive relief was available. *Id.* at 12–13. Finally, the State argues that the district

court had inherent equitable authority to grant injunctive relief. *Id.* at 25–28.

### C.

■ The State's position is untenable because it ignores the scope of § 121 and fails to view the provision in the context of CERCLA, which still contains an express and limited grant of injunctive authority in § 106. Section § 121(e)(2) allows states to enforce requirements of remedial actions embodied in consent decrees under CERCLA and describes requirements of such consent decrees. We may consult legislative history as a secondary source of a statute's meaning, *Miller v. Commissioner*, 836 F.2d 1274, 1282–83 (10th Cir.1988), and our understanding of § 121(e)(2) is in accord with the Conference Report addressing the 1986 amendments enacted by SARA. About § 121(e)(2), the Report indicates:

> States are given the authority to enforce requirements of consent decrees to which the remedial action must conform, in Federal district court. Consent decrees are to contain dispute resolution and enforcement provisions, and may include administrative enforcement. Consent decrees must contain stipulated penalties for violations of the decree of $25,000 per day,[6] enforceable by the President or the State.

H.R.Rep. No. 99–962, 99th Cong., 2d Sess. 249 (1986). Our job in construing statutes is to effectuate the intent reflected in the language of the enactment and the legislative process, however, neither the text of § 121(e)(2) nor the relevant legislative history supports the State's expansive interpretation.

By its express terms, § 121(e)(2) limits a state's enforcement authority to "any Federal or State standard, requirement, criteria, or limitation to which the remedial action is required to conform under this Act [CERCLA]." We agree with amicus United States and the defendants that the term

---

**5.** These other federal and state requirements are commonly designated as "applicable or relevant and appropriate requirements," and abbreviated as ARARs.

**6.** Section 121(e)(2) as enacted allows for penalties "in an amount not to exceed $25,000 per day."

"the remedial action" for purposes of § 121(e)(2) pertains to the remedial action encompassed by § 121. Section 121 unquestionably envisions a remedial action selected by the federal government or its delegates.

Section 121 provides a general description of the criteria, methods, and procedures which EPA must follow in the selection of a remedial action. Section 121 begins:

> (a) Selection of remedial action. The President shall select appropriate remedial actions determined to be necessary to be carried out under section 104 or secured under section 106 which are in accordance with this section and, to the extent practicable, the national contingency plan, and which provide for cost effective response....

Section 121 pertains to remedial actions selected by the President through EPA. Not only in § 121(a), but also in §§ 121(c) and (d)(2)(A), § 121 refers to remedial actions under §§ 104 and 106, which are remedies selected by the federal government or its delegates. Section 121(d) likewise refers to "[r]emedial actions selected under this section or otherwise required or agreed to by the President under this Act...." Thus, the term "remedial action" in § 121(e)(2) means a remedial action which is selected by the federal government or its delegates. The remedial action plan developed by the State of Colorado was not undertaken by the EPA pursuant to CERCLA §§ 104 or 106.[7]

To adopt the State's interpretation would defeat the intended scope of state involvement as contained in § 121(f). Section 121(f) provides a mechanism for state involvement in the selection and adoption of remedial actions which are federal in character. 42 U.S.C. § 9621(f)(1)–(3). For example, states must be given a "reasonable opportunity for ... review and comment" on investigations, feasibility studies, and planned remedial actions. 42 U.S.C. § 9621(f)(1)(E). Prior to entry of a federal consent decree in which the EPA waives a federal or state standard (ARAR), under § 121(d)(4), a state is given an opportunity to concur in the remedial action and, if it does not, the state may intervene as of right. 42 U.S.C. § 9621(f)(2)(A) & (B). If the court upholds EPA'a waiver of a standard, the state may seek to have the standard incorporated into the remedial plan, provided the state pays the additional costs. 42 U.S.C. § 121(f)(2)(B). When the EPA has determined that a particular standard or requirement is an ARAR for a particular remedial action, § 121(e)(2) merely allows a state to enforce that standard or requirement as an ARAR contained in a federal remedial action and implemented by a consent decree.

To allow a state to select a plan independently and then to commence an abatement action under § 121(e)(2) would render these provisions irrelevant. *Akzo Coatings,* 719 F.Supp. at 578. Moreover, in cases in which the EPA has waived a standard and a state does not agree, the state could have two bites out of the apple when it comes to challenging the waiver of an ARAR. *Id.* First, the state could follow the procedure of § 121(f) and seek judicial review prior to the entry of a consent order. *Id.* If the district court upheld the EPA and the state was unwilling to pay the extra cost of incorporating the waived ARAR into the remedial action, the state could seek to enforce the ARAR under § 121(e)(2), all without paying the extra cost required under § 121(f)(2)(B). *Id.*

It is of no moment that such circumstances will not occur in this case because the federal government is not involved in the remedial plan. Peculiar consequences would result from allowing a state to use § 121(e)(2) to compel performance of its

---

**7.** The State's Record of Decision (ROD) puts the matter this way:

> The remedial action in this case is not undertaken pursuant to section 104 or 106 of ... CERCLA, as amended by ... SARA, 42 U.S.C. sec. 9604 and 9606 (1986), respectively. Therefore, the remedial action selection process set out in section 121 of SARA, 42 U.S.C. sec. 9621 (1986), is not strictly applicable. ROD, pl. ex. 168A at 73, *reproduced in* Appellants' Addendum of Exhibits at A–1. The State indicates that notwithstanding it has determined cleanup levels in general conformity with § 121 and the NCP.

remedial plan when that plan was developed without federal involvement. Most significantly, the states would enjoy greater injunctive authority than the federal government, because the federal government must make a showing of "imminent and substantial endangerment to the public health or welfare" when it seeks injunctive relief under § 106; no such showing is necessary under § 121(e)(2). Finally, construing § 121(e)(2) to authorize injunctive relief in these circumstances, but relegating states challenging federal consent decrees to the procedures in § 121(f)(2)(A) & (B) would amount to pure judicial legislation.

### D.

■ Apart from these problems, we also must reject the State's arguments that conforming its plan to the NCP and federal and state standards (ARARs) automatically meant that its independently selected and financed remedial plan was *required* to conform to those criteria within the meaning of § 121(e)(2). Even if the State could overcome the hurdle that § 121(e)(2) identifies a remedial action selected by the federal government or its delegates, the State would have to identify standards with which CERCLA *requires* a state to comply as a prerequisite to selecting a plan. To be sure, several advantages accrue to the State from compliance with CERCLA § 121

and the NCP, *see* NCP Proposed Rule, 53 Fed.Reg. 51,394, 51,458 [8] (Dec. 21, 1988). But § 121(d)(2), with exceptions contained in § 121(d)(4), (f)(2) & (3), *requires* remedial plans selected by the federal government or its delegates to conform to federal and state standards, requirements, criterion, or limitations, regardless of whether response costs are sought. The same cannot be said with respect to remedial plans selected independently by the State, which developed this plan to be "not inconsistent with" the NCP and with attention to § 121, in order to accrue certain advantages, including cost recovery. *See supra* n. 8.

The State has not identified "any Federal or State standard, requirement, criteria, or limitation to which [its] remedial action is *required* to conform under [CERCLA]" *see* CERCLA § 121(e)(2) (emphasis added), within the meaning of § 121(e)(2). The State's reliance upon 40 C.F.R. § 300.71(a)(4) [9] (1989) is misplaced. The State must comply with "all otherwise legally applicable or relevant and appropriate Federal, State, and local requirements, including permit requirements" *id.*, not as a condition to selecting its plan, but *to* recover its costs under § 107. This interpretation is supported by the preamble accompanying the 1985 NCP: "§ 300.71 does set out the requirements that a private party or State must meet for a response to be 'consistent [or not consistent] with the

---

**8.** 53 Fed.Reg. at 51,458 provides in part:

Subpart F does not require that States select remedies for non-Fund-financed State-lead enforcement sites in conformance with CERCLA section 121 and the remedy selection process specified in the NCP. However, where a State-selected remedy does not so conform, States and or PRPs may be at risk in several ways, including but not limited to the following: (1) EPA will not concur with the recommended remedy; (2) EPA may refuse to designate the State as lead agency for any subsequent response activities; (3) States and PRPs may be deprived of the assurance that EPA will find it necessary later to seek to compel further response actions; (4) EPA may be unable to delete a site from the NPL and/or (5) State cost recovery efforts may be hindered.

Failing to comply with CERCLA § 121 and the NCP selection process would appear to carry far more significant consequences than amicus

United States and the defendants are willing to admit.

**9.** 40 C.F.R. § 300.71(a)(4) (1989) provides:

Persons performing response actions that are neither Fund-financed nor pursuant to action under section 106 of CERCLA shall comply with all otherwise legally applicable or relevant and appropriate Federal, State, and local requirements, including permit requirements.

This regulation was superseded by a new NCP effective April 9, 1990. EPA, National Oil and Hazardous Substances Pollution Control Contingency Plan, 55 Fed.Reg. 8,666–8,865 (March 8, 1990). The new NCP provides that "[a]ny person may undertake a response action to reduce or eliminate a release of hazardous substance, pollutant or contaminant," and also sets forth prerequisites for § 107(a) cost recovery, including consistency with the NCP and compliance with ARARs. *Id.* § 300.700(a)–(c), 40 Fed.Reg. 8,858–59.

NCP' to recover its costs from a responsible party pursuant to CERCLA section 107." NCP Final Rule, 50 Fed.Reg. 47,912, 47,934 (Nov. 20, 1985). The EPA explained that "[t]o be consistent with the NCP for the purposes of cost recovery under CERCLA, non-Fund-financed responses must. . . . comply with all otherwise applicable or relevant and appropriate Federal, State and local requirements." *Id.* at 47935.

Nor can the State take comfort from its citation of 40 C.F.R. § 300.68(i)(1)[10] (1989), requiring selection of a remedial plan that complies with federal ARARs. Section 300.68(i)(1) by its terms applies to a "lead agency" which is defined in § 40 C.F.R. 300.6[11] (1989) to include only federal agencies and their delegates. The State is not a lead agency under the regulation.

### E.

The State also contends that its remedial actions were required to comply with the NCP and other standards by virtue of § 107(a). But merely because § 107(a) allows cost recovery for response costs "not inconsistent with" the NCP does not mean that the State's actions were required by § 107(a) and now may enforced by injunctive relief under § 121(e)(2). An action for state cost recovery is permissive, not mandatory. To adopt the State's approach would mean that entitlement to injunctive relief under § 121(e)(2) would turn on whether a state seeks response costs. Building on this argument, however, the State offers the following tautology: once the district court found that the State's plan was "not inconsistent with" the NCP, the elements of the plan became requirements "to which the remedial action is required to conform under CERCLA." That

the plan must conform to itself is circular, but putting that problem aside, the district court's finding that the plan is "not inconsistent with" the NCP merely allows the State response costs on remand (should it choose to implement the plan), not injunctive relief. Neither the State nor anyone else is *required* under CERCLA to implement this specific plan.

### F.

The State's last argument is that the district court had inherent equitable authority to issue the injunction. However, application of a district court's equitable power is not appropriate when the statute carefully limits injunctive relief as a remedy. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19–20, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979); *Shore Realty,* 759 F.2d at 1049; *Ng,* 649 F.Supp. at 1106; *Cadillac Fairview,* 21 Env't Rep.Cas. at 1116. Although the State reminds us of our obligation to construe CERCLA to effectuate its broad remedial purpose, this does not endow federal courts, carte blanche, to upset the balance between federal and state authority envisioned by CERCLA. The states have been given certain express authority in the statute. *See, e.g.,* CERCLA §§ 121(f)(1) (permitting review and comment on proposed remedies); 121(f)(2) (permitting states to seek compliance with state ARARs waived pursuant to 121(d)(4)); 107(a)(4)(A) (allowing cost recovery); 104(d) (providing for cooperative agreements with states); 121(e)(2) (enabling states to enforce ARARs set forth in a federal consent decree, regardless of whether the state is a signatory to that decree). For us to imply injunctive authority in these circumstances

---

**10.** 40 C.F.R. § 300.68(i) (1989) provides:

> *Selection of remedy.* (1) The appropriate extent of the remedy shall be determined by the lead agency's selection of a cost-effective remedial alternative that effectively mitigates and minimizes threats to and provides adequate protection of public health and welfare and the environment. Except as provided in § 300.68(i)(5), this will require selection of a remedy that attains or exceeds applicable or relevant and appropriate Federal public

health and environmental requirements that have been identified for the specific site.

**11.** 40 C.F.R. § 300.6 (1989) provides in pertinent part:

> *Lead agency* means the Federal agency (or State agency operating pursuant to a contract or cooperative agreement executed pursuant to section 104(d)(1) of CERCLA) that has primary responsibility for coordinating response action under this Plan.
> . . .

would exceed what was contemplated by the executive and legislative branches in enacting CERCLA and arrogate to ourselves powers rightfully retained by those two branches of government. *See The Federalist No. 78* (A. Hamilton); *see also* 42 U.S.C. § 9613(h) (limiting federal court jurisdiction concerning challenges to remedial action); *Schalk v. Reilly,* 900 F.2d 1091, 1095–98 (7th Cir.) (judicial challenge to remedial action under CERCLA §§ 104 or 106 permitted only after remedial action is completed), *petition for cert. filed,* No. 90–354 (Aug. 28, 1990); *State of Alabama v. United States EPA,* 871 F.2d 1548, 1557–60 (11th Cir.) (same), *cert. denied,* —— U.S. ——, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989).

## V.

■ As part of the remedial action plan, the district court thought itself empowered to order the defendants to relocate permanently the month-to-month tenants of the Pandora Trailer Park, so that the State could implement its remediation plan. *Idarado,* 707 F.Supp. at 1258–59. The trailer owners rent the land from defendant Idarado. *Id.* at 1259. From the preceding, it is clear that the district court did not derive such power from § 121(e)(2).

■ Defendants argue that the district court's action conflicts with CERCLA § 101(24), which in defining "remedial action" provides in pertinent part:

The term includes the cost of permanent relocation of residents and businesses and community facilities where the *President* determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; . . . .

42 U.S.C. § 9601(24) (emphasis added). As an initial matter, we note that the statute refers to the "cost of permanent relocation," so § 101(24) does not empower the district court to grant injunctive relief to

implement the State's permanent relocation plan. Continuing, however, the district court looked to the purpose of the relocation in deciding that a Presidential order was not a prerequisite for such permanent relocation costs. It determined that because the State was "not attempting to relocate the persons to a new area to isolate them from exposure to toxic waste," but rather to implement its remediation plan for the Idarado facility as a whole, the requirement of a Presidential order contained in § 101(24) did not apply. *Idarado,* 707 F.Supp. at 1258. Another district court has concluded that permanent relocation costs "must be approved by the President to be categorized as reimbursable response costs." *T & E Indus. v. Safety Light Corp.,* 680 F.Supp. 696, 707 (D.N.J.1988).

The legislative history on this point indicates that on-site remediation normally is preferred because it is significantly less expensive. S.Rep. No. 848, 96th Cong., 2d Sess. 55–56. Even among off-site remedial alternatives, permanent relocation is one "of the most costly possible actions." *Id.* "To assist the President in determining the appropriate remedial action, specific criteria are included in the definition of remedy for" permanent relocation. *See id.* at 55. The Senate Report on the bill from which this provision originated continues:

The term "remedy" includes the cost of permanently locating residences, businesses, or community facilities when relocation would be more cost-effective than, an [sic] environmentally preferable to, other off-site remedial actions. In addition to these considerations, a decision to provide permanent relocation may be based, at least in part, on findings from epidemiological or other health effect studies which, in the opinion of the President, demonstrate that a) there is a substantial probability that exposure to hazardous substances from the site has caused or is likely to cause or contribute to adverse health effect; b) even after remedial actions are taken, persons remaining in the vicinity of the site would be exposed to hazardous substances; and c) such exposure has a significant likeli-

hood of causing or contributing to adverse health effects or exacerbating existing conditions.

*Id.* This legislative history confirms that permanent relocation ordinarily would be permissible only upon a Presidential finding that on-site and other off-site cleanup alternatives would not be as cost-effective or environmentally sound as permanent relocation. *See* 40 C.F.R. 300.6 (1989) (definition of "remedy or remedial action").

Thus, the Presidential determination requirement applies when permanent relocation is to protect residents from exposure to hazzardous substances. Given the overriding concern for efficient use of remediation resources, the requirement also should apply when the land on which they reside is to be used for constructing remedial facilities. The statute is broad enough to encompass the latter situation; the President could make a finding that such action "was otherwise necessary to protect public health and welfare," 42 U.S.C. § 9601(24); 40 C.F.R. 300.6 (1989). Merely because the legislative history addresses the most common (and potentially serious) situation does not mean that § 101(24) does not apply to other permanent relocation proposals. The purpose of requiring a Presidential determination for the alternative of permanent relocation is to inform and control discretion concerning the very costly alternative of permanent relocation; our holding serves these purposes. We note that "temporary evacuation and housing of threatened individuals" is within the definition of a removal action under CERCLA § 101(23). 42 U.S.C. § 9601(24); *Lutz v. Chromatex, Inc.,* 718 F.Supp. 413, 419–20 (M.D.Pa. 1989); *T & E Indus.,* 680 F.Supp. at 707. However, the State's plan calls for permanent relocation under CERCLA § 101(24). *See* Appellee's Brief at 45.

Moreover, the district court's decision requiring defendants to bear the costs of permanently relocating the tenants would diminish defendant Idarado's rights under Colorado law, in the likely event that Idarado chooses to cease renting its property so that the property may be used in the cleanup effort. Under Colorado law, a month-to-month tenancy may be terminated on thirty days notice. Colo.Rev.Stat. § 38–12–202(1)(d) (1989 Supp.); *Hurricane v. Kanover, Ltd.,* 651 P.2d 1218, 1222 (Colo.1982). The contended-for judicial rule, that recovery of "permanent relocation" costs is permissible without reference to extant property interests, is a call for abrogation of State-created property interests which the statute or legislative history of § 101(24) does not support. Under the district court's approach, Idarado gets only the burdens of the tenancies, without the obvious benefit that month-to-month tenancies provide should the State perform the plan. The district court's approach would lead to the odd result that, having permanently relocated all the tenants and incurring massive capital expenditures, Idarado would bear the risk that any or all of the tenants could terminate on thirty days notice. CERCLA does not require such fleecing.

REVERSED and REMANDED. Upon remand, the district shall VACATE its mandatory injunction requiring the defendants to perform the State's cleanup plan (as modified) and VACATE its prohibitory injunction concerning the relationship between Idarado and its tenants in the Pandora Trailer Park..